The COCA-COLA BOTTLING COMPANY of Memphis, Tennessee, *d/b/a* Coca-Cola Bottling Company of Arkansas *v.* Fred and Retta GILL

01-768 100 S.W.3d 715

Supreme Court of Arkansas
Opinion delivered March 13, 2003

[Petition for rehearing denied April 17, 2003.*]

---

* THORNTON and HANNAH, JJ., would grant.

*Hill, Gilstrap, Perkins & Trotter*, by: *G. Alan Perkins* and *Julie DeWoody Greathouse*; and *Barrett & Deacon, A Professional Association*, by: *D.P. Marshall Jr.* and *Leigh M. Chiles*, for appellant.

*Whetstone Law Firm*, by: *Bud Whetstone*; and *Law Offices of James F. Swindoll*, by: *James F. Swindoll*, for appellees.

ROBERT L. BROWN, Justice. Appellant, The Coca-Cola Bottling Company of Memphis, Tennessee, d/b/a Coca-Cola Bottling Company of Arkansas, appeals a judgment in the amount of $1,341,666.67 in favor of appellee Fred Gill and a $182,500 verdict in favor of appellee Retta Gill. The total judgment of $1,524,166.67 was reduced by $100,000 due to the Gills' settlement with Waymatic, Inc., making the total judgment $1,424,166.67. Coca-Cola raises three grounds for reversal: (1) Coca-Cola did not violate its duty of ordinary care owed to Fred Gill; (2) the circuit court abused its discretion in barring Coca-Cola from using the Gills' nonsuited allegations against Waymatic, Inc.; and (3) the circuit court abused its discretion in qualifying Jimmy Clark as an expert witness and in admitting into evidence his opinion regarding the cause of Mr. Gill's injuries. We affirm the judgment and the order denying Coca-Cola's posttrial motions.

The facts are gleaned from the testimony at trial. On April 7, 1998, Fordyce High School requested a Coca-Cola concession

trailer for use at the Redbug Relays track meet to be held at the high school. Coca-Cola owns a small fleet of portable concession trailers which it loans to customers, including Fordyce High School, for use at various events and which are towed behind vehicles to their various destinations. Coca-Cola delivered concession trailer #308 to the high school on the date of the accident and left it at a place where the high school principal, Steve Daniel, instructed it to do so. A 120-foot, 15-amp cord, which was permanently attached to the trailer, was plugged into a receptacle in the field shed with a three-prong plug for grounding. The receptacle ground wire in the shed had been disconnected. No auxiliary grounding system in the form of an eight-foot metal rod beside the trailer was used. School employees set up the trailer, and while doing so, Fred Gill, who was then age 70 and a custodian at the high school, was injured by an electrical shock when he raised the windows of the concession trailer. Steve Daniels heard Mr. Gill make a strangled noise when he plugged in the trailer. He then tried to help Mr. Gill, and was shocked with enough force to knock him to the ground when he touched him. He then touched the trailer and felt current go through his hand. He immediately unplugged the trailer. Mr. Gill fell to the ground. The shock broke both of Mr. Gill's shoulders and burned his hands and feet. Mr. Daniel testified that Mr. Gill was unconscious and stopped breathing for a period of time. He suffered permanent injuries as a result and, according to his brothers' testimony, he is confined to a wheelchair.

On January 6, 1999, the Gills filed suit against Waymatic, Inc., the manufacturer of the trailer at issue in this case, and Coca-Cola. The complaint alleged that "a Coca-Cola vending trailer manufactured by . . . Waymatic, Inc. electrically shorted to ground through plaintiff Fred Gill's body and as a direct and proximate result, caused damages." The Gills asserted a two-part products-liability cause of action against Waymatic. They asserted that the trailer had been manufactured in a defective and unreasonably dangerous condition. Specifically, they alleged:

- that the trailer had no "self-sufficient or ground fault system;"

- that the trailer had "inadequate wiring precautions" during the design and manufacture of the trailer;

- that the trailer had inadequate warnings to users that it did not have a sufficient grounding system;

- that Waymatic knew that the electrical system in the trailer was inadequate and failed to recall it;

- that Waymatic failed to adequately warn users against the dangers of the trailer's electrical system.

The Gills' second allegation against Waymatic was that it had negligently designed the electrical system in the trailer.

The complaint further alleged that Coca-Cola "negligently failed to maintain or monitor the decaying electrical system or negligently failed to inspect said trailer, all of which were the proximate cause of the injuries of [the] plaintiff . . . ." The complaint asserted joint and several liability against Waymatic and Coca-Cola and asked for compensatory damages against Coca-Cola and both compensatory and punitive damages against Waymatic.

On July 11, 2000, the Gills filed their first amended complaint. In the amended complaint, the Gills added two allegations to its negligence claim against Coca-Cola: (1) Coca-Cola negligently removed the lug nut from the trailer through which a wire could be threaded to attach to a metal rod as part of an auxiliary grounding system; and (2) Coca-Cola negligently failed to warn users of how to use the trailer safely. The Gills' claims against Waymatic were left unchanged. On October 6, 2000, the Gills filed their second amended complaint and added two allegations to support their strict-liability claims against Waymatic: (1) Waymatic failed to instruct users on grounding the trailer and in the use of the auxiliary grounding system, and (2) Waymatic failed to inform users that use of the auxiliary grounding system was necessary for the trailer's safe operation. In this pleading, the Gills dropped their punitive damages claim against Waymatic.

Just before trial, the Gills settled their complaint against Waymatic for $100,000. On February 1, 2001, the circuit court granted the Gills' oral motion to nonsuit their lawsuit against Waymatic. On February 2, 2001, the circuit court held a pretrial motions hearing on both Coca-Cola's motion for summary judgment and its motion *in limine* to allow admission of the Gills' alle-

gations against Waymatic contained in the nonsuited portions of their complaint. The circuit court denied both motions.

On February 5, 2002, the trial began and lasted two days. Mike Easterwood, the president and CEO of Waymatic, testified for the Gills via deposition. He testified generally about Waymatic's "S" type of concession-stand trailer, of which trailer #308 is an example and described the auxiliary grounding system that Waymatic provides with them. The grounding system, according to Mr. Easterwood, is simply a lug nut with a hole in it, mounted on the tongue of the trailer. The grounding system is operated by threading a piece of copper wire through the hole and the other end of the wire to a grounding rod — an eight-foot metal pole which is driven into the ground. He described the auxiliary grounding system as a safety measure that assures that the trailer is always grounded. He testified that he considered such lug nut grounding systems standard in the industry and that he assumed that customers who bought the trailers would realize the purpose of the lug nut. On cross examination, Mr. Easterwood admitted that Waymatic does not supply a grounding wire or rod with the trailers, only the lug nut; nor does Waymatic provide its customers with instructions on how to use the lug nut.

Several witnesses testified and gave their opinions about what caused Mr. Gill's injuries. Mr. Edward McMillan testified that he worked for Ledbetter Electric as an electrician and was dispatched the day of the accident to the high school at the request of the high school, where he examined the trailer which was still "hot." His most definitive statement on causation came during cross-examination: "It's my opinion that the cause of the accident as it was described to me was the disconnected ground wire in the shed." He agreed with the Gills' theory of the accident when he was asked in a hypothetical question about cord shorting and then moving the cord. On cross-examination, however, Mr. McMillan disagreed with the assumption of the hypothetical and stated that he did not think there was a problem with the cord based on his testing of the shed receptacle and the trailer.

Mr. Jimmy Clark testified as an expert and fact witness for the Gills and blamed wiring in the cord and trailer as causes of the accident. He testified on re-direct examination:

> [I]f you're wanting to talk about probabilities, I think it's a 100% probability that the fault that caused the incident that hurt Mr. Gill was in the cord or the concession stand. If you want to consider that whole thing as a package, it's 100% in my opinion that that's what happened. . . . Had it been grounded, Mr. Gill would not have been hurt.

He further testified on re-cross examination that even if the shed receptacle had been grounded, it would not have guaranteed Mr. Gill's safety:

> It could have been grounded at the receptacle in the shed, but that doesn't necessarily mean that it wouldn't have done the same thing. I'm telling this jury that a ground wire on the receptacle in the shed that is required by the National Electrical Code would not necessarily have protected someone touching the trailer even if it was electrified.

Mr. Clark further testified that a new cord had replaced the older cord by the time he examined the trailer four months after the accident. He said that "it was 95% probable that it was the cord" that caused the accident. He described the percentage as a "wild guess." He opined that had the cord been grounded by an auxiliary system, the accident would not have occurred.

Mr. Peter Reynolds testified as an electricity expert for the Gills and concluded that the combination of an ungrounded receptacle in the shed, the lack of an auxiliary grounding system with a ground rod, and electricity from the cord coming in contact with the trailer caused the accident:

> As I said earlier, at least three things had to go wrong . . . . They had not connected the ground connection in the shed. We also know the second thing going wrong that day was that the external grounding connection, the ground rod and the lug, had not been used. The third thing that occurred was that somehow the electricity that was coming in on the wire from the shed got connected to the frame of the trailer.

Mr. Reynolds based his expert opinion on tests that he performed on the shed after the accident and on Mr. Clark's testimony. He further testified that in his experience it was "prudent" to have an auxiliary grounding system and that invariably this was done. He added that when he worked with trailers with a former employer, they required that all their trailers be grounded while they were in the field and operational.

Mr. Lonnie Buie testified as an electricity expert for Coca-Cola. Mr. Buie tested the trailer at the Camden service center a year after the accident. He testified that he found no problems with the cord attached to the trailer at that time. He also had trouble finding conductivity between the power cord to the window that Mr. Gill touched when he was injured. His opinion was that the receptacle and grounding system in the shed did not comply with the National Electrical Code. He concluded that what caused the accident could not be determined with certainty but that having a ground in the shed receptacle would have undoubtably prevented the accident:

> I cannot say exactly how the accident happened. There are too many conflicting eyewitnesses, and accounts to be able to determine exactly what happened out there. I don't know that anybody, and several people have tried, can come up with any logical conclusion of how this happened. There's been a lot of speculation and a lot of guesses, but really we don't know. Mr. Reynolds, Mr. McMillan, and I all agree, however, that if the receptacle in the shed had been grounded, the accident wouldn't have happened.

Mr. Buie was impeached by a memo written by a Coca-Cola attorney following a telephone conversation with a "John Harrell," identified as an employee of the Camden warehouse where trailer #308 was housed. That memo read in part: "Harrell did say that these trailers had a place for a ground to be connected. Apparently, we never utilized this because it involved a stake that if it was not pulled up and the drivers attempted to haul the trailer away, the stake would be run over and would puncture a tire. This causes me some concern."

Mr. Harrell, identified in the memo, is actually, John Harold. He testified as follows on cross-examination:

GILLS' ATTORNEY. Did you not tell that lawyer that you never utilized this grounding system because it involved a stake that if it was not pulled up the drivers attempted to haul the trailer away, the stake would be run over and would puncture a tire?

HAROLD. I told the lawyer when we were doing a what if for a better word, what we could have done, and after the fact, and I found out that there was a — some kind of system that could be used, but it's just not practical. I could have said that. I don't recall really the total conversation, it was on the telephone and it was several months after the incident occurred and we were talking about what if, what could have been done.

GILLS' ATTORNEY. Said that meaning that "You never utilized this stake because if not pulled up the drivers attempted to haul the trailer away the stake would be run over and would puncture a tire."

HAROLD. I could have made that statement when we were talking why we wouldn't use it. Just doing a what if after the fact.

The jury returned a judgment for $1,341,666.67 for Fred Gill and in the amount of $182,500.00 for Retta Gill for loss of consortium. The circuit court credited the amount of the Waymatic settlement in the amount of $100,000.00 against the Fred Gill verdict, for a total judgment of $1,424,166.67. In a motion for a new trial or judgment notwithstanding the verdict, Coca-Cola raised essentially the same issues that are before this court in this appeal, but also requested a remittitur of the judgment amount. The circuit court denied that motion.

### I: Duty Owed

Coca-Cola's first argument is that it owed only a duty of ordinary care to Mr. Gill and that it was entitled to assume that the shed at Fordyce High School had a properly grounded receptacle. Because of this, Coca-Cola contends that the circuit court erred when it denied its motion for a directed verdict. The Gills initially counter this assertion with a procedural argument. They contend that Coca-Cola failed to preserve its duty argument. We disagree.

The Gills claim that when Coca-Cola moved for a directed verdict at the close of their case, it argued that an intervening cause, the faulty receptacle in the shed, broke the chain of proximate causation. The Gills claim, however, that Coca-Cola did not mount the argument that it owed no duty to Mr. Gill based on the fact that he was not a foreseeable plaintiff. Thus, they contend, Coca-Cola is foreclosed from arguing lack of foreseeability on appeal to this court, because the issue is not preserved.

We turn then to the motion for directed verdict. In its motion, Coca-Cola initially stated that it was entitled to rely on its assumption that Fordyce High School would abide by the National Electrical Code in connection with the receptacle in the shed, because everyone is assumed to know and obey the law. Because it relied on this assumption that the shed's receptacle was adequately grounded, it could not be negligent, according to Coca-Cola, even assuming, *arguendo*, that there was a problem with the trailer. The Gills responded to this motion by stating that irrespective of whether a faulty ground in the field shed was an intervening cause, "Coca-Cola had a duty to foresee that if they removed the safety system that would have provided protection to Fred Gill . . . the courts could go back [and find negligence.]" Coca-Cola responded that the Gills had mischaracterized its argument as an intervening-cause argument, when really the question was one of duty: "Your Honor, I think [Gills' counsel is] mixing up two areas of the law. . . It's part of the definition of the duty of Coca-Cola. If [Coca-Cola] has the right to assume that someone acts a certain way and if action upon that is not negligence there's no question about intervening cause. . . ." The circuit court ruled: "Whether or not Coca-Cola was negligent in its handling

of the cord and whether or not it was negligent in the removal of the redundant safety system . . . would be question [sic] of fact for the jury and there's sufficient evidence at this time to allow those two issues to go to the jury."

When the motion for directed verdict was renewed, Coca-Cola continued to argue that it proved the standard duty of ordinary care to Mr. Gill and could assume the receptacle in the field shed was adequately grounded. The Gills contended that Coca-Cola failed in its duty, by removing or not installing, the auxiliary system that would have protected Mr. Gill.

We conclude that the issue of a duty owed to foreseeable victims was raised by counsel for the parties and ruled upon by the circuit court. It appears that it was initially the Gills' counsel who redirected the circuit court to the issue of duty based on foreseeability. Coca-Cola then shifted its focus to the duty owed. In doing so, Coca-Cola clarified for the court that its objection was not about intervening causation, but about the duty owed to Mr. Gill in light of the high school's failure to ground the receptacle in the shed. The circuit court concluded that the issue of Coca-Cola's negligence was one for the jury. That ruling necessarily encompassed the issue of breach of the duty that was owed. *See* W. Page Keeton, et. al., *Prosser and Keeton on the Law of Torts* § 30 at 164 (5th ed. 1984) ("[Duty and breach] go to make up what the courts usually have called negligence; but the term quite frequently is applied to the second alone. Thus it may be said that the defendant was negligent, but is not liable because he was under no duty to the plaintiff not to be.").

Turning to the merits of the duty issue, when reviewing a denial of a motion for a directed verdict, this court assesses whether the jury's verdict is supported by substantial evidence. *See Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002); *State Auto Prop. & Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999); *Dodson v. Charter Behavioral Health Sys. of Northwest Arkansas, Inc.*, 335 Ark. 96, 983 S.W.2d 98 (1998). Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond

mere suspicion or conjecture. *See Wal-Mart Stores, Inc. v. Lee, supra; State Auto Prop. & Cas. Ins. Co. v. Swaim, supra; City of Little Rock v. Cameron*, 320 Ark. 444, 897 S.W.2d 562 (1995). When determining the sufficiency of the evidence, this court reviews the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *See Wal-Mart Stores, Inc. v. Lee, supra; State Auto Prop. & Cas. Ins. Co. v. Swaim, supra; Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997).

Coca-Cola argues that the following facts demonstrate that Mr. Gill's shock was not reasonably foreseeable for several reasons: the trailers had been used for almost twenty years without mishap; the manufacturer, Waymatic, did not provide the wiring or eight-foot grounding rod for an auxiliary grounding system for the trailers, and never told Coca-Cola what the purpose of the lug nut on the trailer tongue was; and Coca-Cola had never encountered a problem with an ungrounded power source in all of its history of using these trailers. Moreover, Coca-Cola contends that it knew nothing about the condition of the electrical outlet at the Fordyce High School field shed and nothing in the long history of using that outlet alerted it to the fact that a problem was even possible, let alone reasonably foreseeable. In sum, Coca-Cola's argument is that "[t]he uneventful history with these concession trailers showed that Mr. Gill's accident was extraordinary."

The Gills respond that as a vendor of concession trailers, Coca-Cola is charged with the knowledge of common industry practices, and there was testimony at trial that vendors such as Coca-Cola generally knew about auxiliary grounding systems and how to use them. The Gills argue that the record also shows that vendors do not usually allow their customers to set up the trailers; rather, they take that responsibility on themselves. They further maintain that the facts support a jury conclusion that Coca-Cola had removed the lug nut for an auxiliary grounding system, because the trailer was shipped to Coca-Cola with the nut, and by the day of the accident, the nut was gone. Moreover, they contend that the original electrical cord for the. trailer had been replaced. The original trailer cord had plugs at each end and was a

50-amp cord, as opposed to the replacement cord that was permanently attached to the trailer and was a 15-amp cord. According to the Gills, the replacement cord being moved through a metal hole placed more wear and tear on the cord. They conclude that the facts support the conclusion that "Coca-Cola had a duty to ensure the proper installation of its trailers or at a minimum, provide its users with instructions and/or warnings regarding the serious risk of shock which it had itself created by removing the safety ground system."

■ ■ This court has succinctly described what constitutes a question of law and what constitutes a question of fact in the negligence analysis:

> The threshold question is whether the appellee owed a duty of any kind to the [appellant]. Whether a duty is owed between the parties is a question of law. . . . [T]he question of foreseeability and causation may be a question of fact, depending on the circumstances. Proximate causation is ordinarily a question of fact.

*Stacks v. Arkansas Power & Light Co.*, 299 Ark. 136, 138-139, 771 S.W.2d 754, 756 (1989) (citations omitted). *See also Cash v. Lim*, 322 Ark. 359, 362, 908 S.W.2d 655, 657 (1995); *Keck v. American Employment Agency*, 279 Ark. 294, 652 S.W.2d 2 (1983); *Missouri Pac. R.R. Co. v. Harrelson*, 238 Ark. 452, 382 S.W.2d 900 (1964). This court has added: "If the court finds that no duty of care is owed, the negligence count is decided as a matter of law." *Mans v. Peoples Bank of Imboden*, 340 Ark. 518, 524, 10 S.W.3d 885, 888 (2000). We have said that "[t]o constitute negligence, an act must be one from which a reasonably careful person would foresee such an appreciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner." *Ethyl Corp. v. Johnson*, 345 Ark. 476, 481, 49 S.W.3d 644, 648 (2001) (quoting *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998)).

■ ■ However, a defendant is under no duty to guard against risks it cannot reasonably foresee. *Ethyl Corp.*, 345 Ark. at 481, 49 S.W.3d at 648. ("[N]egligence cannot be predicated on a failure to anticipate the unforeseen.") (quoting *Keck v. American Emp. Agency*, 279 Ark. 294, 652 S.W.2d 2 (1983)). Proof of an

accident, with nothing more, is not sufficient to make out a claim for negligence, *see Mahan v. Hall*, 320 Ark. 473, 897 S.W.2d 571 (1995), and harm that is merely possible is not necessarily reasonably foreseeable. *Boren v. Worthen Nat. Bank*, 324 Ark. 416, 427, 921 S.W.2d 934, 941 (1996) ("[C]onceivability is not the equivalent of foreseeability.") (quotations and citations omitted). In Judge Cardozo's immortal words: "Negligence in the air, so to speak, will not do." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 341, 162 N.E. 99, 99 (1928); *see also Hill v. Wilson*, 216 Ark. 179, 183, 224 S.W.2d 797, 800 (1949) ("There is no such thing as 'negligence in the air'. Conduct without relation to others cannot be negligent; it becomes negligent only as it gives rise to an appreciable risk of harm to others.").

■ The question, however, is not whether a defendant could have reasonably foreseen the exact or precise harm that occurred, or the specific victim of the harm. *See Wallace v. Broyles, supra.* It is only necessary that the defendant be able to reasonably foresee an appreciable risk of harm to others. *Id.* An example of this distinction is contained in a landmark case cited by this court in *Broyles. See Jordan v. Adams*, 259 Ark. 407, 533 S.W.2d 210 (1976). In *Jordan*, Adams sued for injuries sustained when Jordan, enraged by an argument that he had with a man who was talking to his female companion, threw his companion's purse across a crowded bar dining room, causing a pistol inside the purse to discharge and hit Adams in the leg. Jordan argued that Adams was not a foreseeable plaintiff, because he did not know that the pistol was inside the purse when he threw it. The circuit court disagreed, and this court affirmed. We said: "if the act is one which the party in the exercise of ordinary care ought to have anticipated was likely to result in injury to others, then such person is liable for the injury proximately resulting therefrom although he may not have foreseen the particular injury which did happen." *Jordan*, 259 Ark. at 411, 537 S.W.2d at 212. In agreeing that Adams was a foreseeable plaintiff, we said that even assuming that Jordan did not know that the pistol was in the purse, "it was a culpably negligent act for him to throw a purse (large enough to hold a pistol and other things a woman carries therein) 26 feet across an area where people were dining and drinking." *Id.* at

412, 533 S.W.2d at 213. Citing *Palsgraf v. Long Island R.R. Co.*, *supra*, we held that Adams was a foreseeable plaintiff: "Mrs. Adams was certainly within the foreseeable group of persons who might be injured by Jordan's negligence, and it was not necessary that he foresee the exact manner in which the injury would be caused." *Id.*

■ Under the *Jordan* reasoning, Mr. Gill was unquestionably a foreseeable plaintiff. Employees setting up the concession stand, as well as members of the public, would certainly be expected to come into contact with the concession trailer. There was, further, evidence that Coca-Cola had significantly changed the trailer's electrical system that first had the two-plug, 50-amp cord and additional evidence that Coca-Cola had chosen not to install an auxiliary ground system using the eight-foot metal rod and, indeed, had removed the lug nut on the trailer's tongue. Mr. Easterwood testified that the use of an auxiliary grounding system was standard practice in his industry. There was also testimony, including that of Peter Reynolds, that a permanently attached cord inside the trailer that had to be threaded through a metal hole could cause more wear and tear to the cord itself, conceivably causing it to short out. Mr. Reynolds, in his expert testimony, expressly concluded that three things had to go wrong to cause the accident: (1) no ground connection in the shed; (2) no secondary grounding system using the lug nut; and (3) electricity transferred from the shed to the trailer by means of the cord. We conclude that this evidence easily qualified as substantial on the foreseeability point regarding Mr. Gill as well as on causation. *Ethyl Corp. v. Johnson, supra.*

■ Coca-Cola's history of no accidents in the past does not defeat this analysis. An abundance of good luck does not shield a defendant from guarding against foreseeable risks. *Accord Advance Chemical Co. v. Harter*, 478 So.2d 444, 448 (Fla. Dist. Ct. App. 1985) ("if the injury is reasonably foreseeable, even if rare, the seller cannot rely on its history of good fortune to exempt itself from liability."). As in *Jordan*, where the defendant's asserted lack of knowledge of the contents of the purse that he tossed across a crowded room did not exempt him from owing a duty of ordinary care to the patrons of the bar, Coca-Cola's lack of

knowledge that Fordyce High School's electrical outlet in the shed was defectively grounded does not defeat its duty, under these facts, to take ordinary, prudent precautions to protect Mr. Gill, including an auxiliary grounding system. Not only did Coca-Cola fail to install an auxiliary grounding system for the trailer, but it failed to test the grounding system in the shed to assure that it was operational.

■ Coca-Cola owed a duty of ordinary care to Mr. Gill. But, in addition, the fact that Mr. Gill and members of the public would be coming into contact with the trailer and would be harmed if the trailer was not properly grounded was a foreseeable risk. We affirm the circuit court on this point.

## II: Waymatic Allegations

Coca-Cola next argues that it should have been allowed to use at trial the Gills' allegations against Waymatic contained in their first and second amended complaints. It argues that the Gills' specific and detailed products-liability claims against Waymatic, when contrasted with the "bare allegations" of negligence against Coca-Cola, established Waymatic as the primary tortfeasor early on. Coca-Cola argues that the circuit court misunderstood the governing precedents and, thus, erred in deciding this question. It cites *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001), in support of its argument.

The Gills answer that it named both Coca-Cola and Waymatic as defendants in its complaint, and that neither party was clearly the "target defendant" in the first lawsuit so as to prejudice Coca-Cola when it was tried alone. They also point out that Coca-Cola received credit, $100,000, from the Waymatic settlement, which means no prejudice was visited on Coca-Cola by the court's disallowance of this impeachment. Finally, they emphasize that the *Dodson* case was handed down several months after the circuit court ruled on the admissibility of the complaints.

Coca-Cola is correct that the circuit court relied on the wrong line of cases, including *Razorback Cab of Fort Smith*, 304 Ark. 323, 802 S.W2d 444 (1991), in excluding use of the allegations made in the Gills' complaint for impeachment purposes.

The question presented in *Razorback Cab* was "whether a *complaint* may be properly introduced in evidence to sustain the plaintiff's case." *Razorback Cab*, 304 Ark. at 325, 802 S.W.2d at 445 (emphasis in original). This court held that it could not. That holding followed the earlier cases of *Wright v. Hullett*, 245 Ark. 152, 431 S.W.2d 486 (1968) and *Henry Wrape Co. v. Barrentine*, 129 Ark. 111, 195 S.W. 27 (1917). Thus, *Razorback Cab* is descended from cases that prohibit plaintiffs from using their own pleadings as evidence. The rule exists because complaints, which are "normally phrased in the most partisan language," are inadmissible because they are self-serving. *Razorback Cab*, 304 Ark. at 325, 802 S.W.2d at 445.

On the other hand, as Coca-Cola contends, *Dodson v. Allstate Ins. Co., supra*, and its predecessors hold that a party's complaint may be used as impeachment evidence against that party and the statements made in a complaint are admissions for impeachment purposes. *See Dodson, supra. Accord Jernigan v. State*, 38 Ark. App. 102, 828 S.W.2d 864 (1992) (allowing the use of a defendant's complaint filed in an earlier civil suit to impeach her at her criminal trial). *Cf. McDaniel v. State*, 291 Ark. 596, 726 S.W.2d 679 (1987) (use of a transcript of a plea agreement hearing admissible to impeach defendant). *But see Missouri Pac. R.R. Co. v. Zolliecoffer*, 209 Ark. 559, 563, 191 S.W.2d 587, 589 (1946) (holding that admissions in a complaint are not admissible where the complaint was not signed or verified, and the plaintiff testified that the allegations in the complaint were "entirely those of his attorneys.").

In *Dodson*, the circuit court had refused to allow Dodson, as plaintiff, to use as evidence withdrawn allegations in the defendants' counterclaim where they asserted that Dodson was performing illegal and fraudulent acts in providing physical-therapy treatment. This court reversed the circuit court and held that Dodson was entitled to use withdrawn allegations of Dodson's wrongdoing for impeachment purposes against defendant Allstate Insurance's stance at trial that it never asserted Dodson had done anything wrong.

 We conclude that the circuit court ruled correctly, albeit it relied on the wrong line of cases in doing so. In reaching

our conclusion, we are persuaded in part by the reasoning of our court of appeals in *Belz-Burrows, L.P. v. Cameron Const. Co.*, 78 Ark. App. 84, 78 S.W.3d 126 (2002). In *Cameron*, the owner of a development sued its general contractor for constructing the project in an unworkmanlike manner. The general contractor, in turn, sued the owner's tenant for misuse of the premises, but then nonsuited its cause of action against the tenant. At trial, the owner sought to introduce proof of the nonsuit to show that if the contractor believed the tenant was to blame, it would not have nonsuited its cause of action. The court of appeals then drew a distinction between a withdrawn pleading such as occurred in *Dodson* and filing a nonsuit:

> [T]here is a significant difference between the admissibility of a withdrawn pleading and the admissibility of the fact that a nonsuit was taken. The admissibility of a withdrawn pleading rests on the fact that it is considered an admission and is inconsistent with the present position of the party who filed it. When a party states a fact in a pleading, he is averring that it is true; therefore, if at trial he takes a position contrary to the one taken in the pleading, a clear inconsistency is revealed. The same reasoning does not necessarily apply to the taking of a nonsuit. Unlike a pleading, a nonsuit is not defined by its content; it does not necessarily express a statement or assert a position. A pleader who takes a nonsuit does not necessarily admit that his suit has no basis; rather, a nonsuit is often taken for other reasons, such as settlement or trial strategy. In light of that fact, we are reluctant to accord a nonsuit the same impeachment value as a withdrawn pleading. We cannot say, therefore, that the trial court abused its discretion in excluding the nonsuit from evidence.

*Cameron*, 78 Ark. App. at 91-92, 78 S.W.3d at 131.

In the case at hand, the Gills and Waymatic settled, and the Gills nonsuited their complaint against Waymatic. We believe, as the court of appeals held in *Cameron*, that a nonsuit following settlement differs from a situation where allegations have been simply withdrawn. We are also reluctant, as was the circuit court, to permit the impeachment requested by Coca-Cola due to its potentially negative implications for parties who wish to settle. But, more significantly, in the instant case, Coca-Cola sought to use nonsuited allegations against a former party-defendant, Way-

matic, as evidence that Coca-Cola was not the primary tortfeasor. Coca-Cola cites us to *Dodson* and certain predecessors but adduces no authority for using a plaintiff's nonsuited allegations against a former party-defendant, and we know of none. We conclude that to allow this impeachment would ultimately have been confusing to the jury and suggestive of the fact that a settlement had occurred between the Gills and Waymatic. We hold that there was no abuse of discretion on the part of the circuit court in denying Coca-Cola the right to use the allegations made against Waymatic.

### III: Expert Witness

Coca-Cola next questions (1) the circuit court's qualification of Jimmy Clark as an expert witness for the Gills on electricity, and (2) the circuit court's refusal to strike Mr. Clark's testimony as incompetent expert testimony. It urges that in both instances this was an abuse of discretion by the circuit court under our Rules of Evidence and our case law and adduces Ark. R. Evid. 702 and *Farm Bureau Mut. Ins. Co. of Ark. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000) in support of its argument.

We address the issue of Mr. Clark's qualifications first. He testified that he began working at one of ALCOA's Arkansas plants when he was seventeen years old and worked as a helper for the plant's chief electrical engineer, Robert McAdory. In this role, he became interested in Mr. McAdory's library of electrical engineering books, and with his encouragement, he studied them and eventually got a job in Mr. McAdory's department. Mr. Clark testified that although the ALCOA plant did not have an apprenticeship program for electricians, he took tests to become certified as an electrician, which he passed. At the same time, Mr. McAdory tutored him and allowed him to study the materials in an electrical engineering course he was taking. Mr. Clark added that he took correspondence courses in electrical engineering.

He eventually became a journeyman electrician and the head electrician at the ALCOA plant, a title he held for eighteen years. He testified that "head electrician" was an informal title but that he was good enough to be given work normally assigned to electrical engineers. He stated that his duties included design work on

electrical projects. Mr. Clark further testified that he started a house-wiring business on the side during his tenure at ALCOA, where he employed up to six people. He testified that, as part of this business, he became a master electrician for the state.

On *voir dire*, Mr. Clark admitted that he did not currently have an electrician's license or an electrical engineering license, and he stated that he did not consider himself an electrical engineer. He admitted that he had not worked actively in electrical matters since 1970 but that he did maintain an interest in the field and had kept abreast of developments. He further testified that, although the field had changed since 1970, the "elementary things stay the same." He also admitted that he was unfamiliar with the intricacies of the National Electrical Code.

██ ██ The circuit court qualified Mr. Clark as an expert on the subject of electricity and as a fact witness, because he had inspected the trailer and been to the Coca-Cola plant with Gills' counsel. The court ruled:

> Let me sum up what we have here. We have a witness who has some expertise. His license is not current, but he is not a practicing electrician. So, he doesn't have to have a license. He possesses sufficient knowledge, skill, training, and education to testify about the subject matter before him, plus he is a fact witness to testify about what he saw and observed. So I will qualify him both as fact and expert. (sic) He may express opinions.

The Arkansas Rules of Evidence are helpful in resolving this issue. Rule 702 reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Ark. Rule Evid. 702. We review a circuit court's qualification of a witness as an expert for an abuse of discretion. *E.g., New Prospect Drilling Co. v. First Commercial Trust*, 332 Ark. 466, 966 S.W.2d 233 (1998). In 2000, this court adopted the seminal United States Supreme Court case interpreting Rule 702. *See Farm Bureau Mut. Ins. Co. of Ark. v. Foote, supra,* (adopting *Daubert v. Merrell Dow*

*Pharm., Inc.,* 509 U.S. 579 (1993)). Under *Foote* and *Daubert,* the circuit court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning and methodology used by the expert has been properly applied to the facts in the case. *See Foote,* 341 Ark. at 116, 14 S.W.3d at 519. Rule 702 guidelines apply equally to all types of expert testimony and not simply to scientific expert testimony. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999).

Rule 702 does not condition the admissibility of an expert's testimony solely on the expert's professional accolades or lack thereof. *See Daubert, supra; John Parker Const. Co. v. Aldridge,* 312 Ark. 69, 847 S.W.2d 687 (1993) (experts may be qualified by experience, knowledge, or training, and need not be licensed professionals); *see also, e.g., Tank v. C.I.R.,* 270 F.2d 477 (6th Cir. 1959) (absence of certificates, memberships, and other professional honors does not in and of itself make a witness incompetent as an expert.); *Dickerson v. Cushman, Inc.,* 909 F.Supp 1467 (M.D. Ala. 1995) (lack of degree or license in professed area of expertise goes to weight of expert's testimony, not its admissibility).

Coca-Cola argues that "[a]t best, Clark had stale experience and a cavalier attitude about the qualifications necessary to be an electrician." We conclude, however, that questions surrounding the staleness of Mr. Clark's electrical experience affected the weight to be given his testimony, and not whether he should be qualified as an expert. The circuit court also had Mr. Clark's testimony that he was current with developments in his field. He certainly had considerable training and work experience in electricity, and he informed the jury about basic principles of conductivity and the grounding of electrical power. He was not required to have an electrician's license to testify. We hold that Mr. Clark's knowledge and experience were sufficient to assist the trier of fact in understanding the evidence and in determining the fact issues, which is the test under Rule 702. The circuit court did not abuse its discretion in qualifying Mr. Clark as an expert in electricity.

We turn next to Coca-Cola's assertion that Mr. Clark's testimony was incompetent expert testimony. According to Coca-Cola, under Rule 702, the circuit court must make certain that there is an adequate nexus between the expert's conclusions and the methodology used to arrive at those conclusions. Coca-Cola points out that the circuit court is under no obligation "to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). In short, Coca-Cola urges that the expert must explain how his methodology, when applied to the actual facts of the case, leads ineluctably to the opinion offered. *See id.* Coca-Cola argues that Mr. Clark's methodology fell short. According to Coca-Cola, it consisted merely of walking around the accident site, which does not provide an adequate foundation for an opinion that the electrical cord caused the accident. Furthermore, Coca-Cola emphasizes that Mr. Clark conducted no tests on the electrical cord or on any other part of the trailer or on the field shed outlet.

In examining Mr. Clark's testimony, we ascertain that his principal points were (1) that a short in the field shed receptacle by itself was not the cause of the injury to Mr. Gill; (2) that the trailer should have been grounded with a metal rod; and (3) that what made the accident possible was a short in the trailer's power cord. With respect to the first two points, the testimony adduced at trial and by deposition gave him a sufficient basis of data upon which he could construct an expert opinion. *See* Ark. R. Evid. 703. Mr. Clark specifically mentioned in his testimony that he had read the depositions of Mr. McMillan, who examined the trailer immediately after the accident, Mr. Buie, and one of the officers of Waymatic. In addition, he had studied relevant photographs. His offered opinion was that, after applying general principles of electricity to these facts, he reached the conclusion that something in the electrical power supply to the trailer caused the accident. In our judgment, this constituted a satisfactory basis for rendering an expert opinion.

Regarding the third point, Mr. Clark personally observed the cord connected to the trailer when he and the Gills' counsel visited the Camden warehouse and saw trailer #308 some

four months after the accident. He concluded that the cord was shiny and new.[1] Mr. Clark testified that he had seen thousands of power cords during his career working at ALCOA and in his consulting business and that that experience gave him a sufficient basis for determining whether a power cord was new simply by looking at it. He concluded, based on this observation, that the cord had been replaced between the time of the accident and the time of his observation. He then went on to testify, as an expert witness who was qualified by virtue of his experience, that the old cord might have been damaged and that this might have caused the electrical short to the trailer. This testimony was corroborated by Peter Reynolds, who testified that the weakest part of any piece of portable electrical equipment is the cord. Other witnesses, including Coca-Cola's own expert, Mr. Buie, testified that the power cord might undergo significant wear and tear. We cannot say that Mr. Clark's opinion that the cord had been replaced and that an old, damaged cord could have caused the short was incompetent evidence. There was no error in allowing Mr. Clark's opinion in this regard.

We note, as a final point, that Coca-Cola makes much of Mr. Clark's statement that his opinion that the cord was 95% the likely cause of the accident was a "wild guess" and speculation. But Mr. Clark added that he was 100% certain that an electrical failure in the cord or the trailer was the cause. We agree with the circuit court, which decided against striking Mr. Clark's testimony on this point, that Mr. Clark believed the original power cord was missing and that conditions on the day of the accident could not be replicated. Thus, by necessity, since the original cord could not be examined, his testimony about the percentage of causation due to a faulty cord was speculation. Mr. Clark's lack of certainty about the role of the cord in the accident goes to the weight of his opinion, not its admissibility. The circuit court's announced ruling was that Coca-Cola was free to cross-examine Mr. Clark about these statements. The circuit court did not err in this regard.

---

[1] There was no contention at trial or in this appeal that a replacement cord was a subsequent remedial measure subject to exclusion under Ark. R. Evid. 407.

Because we conclude that Mr. Clark's testimony was competent expert testimony, we need not address Coca-Cola's contention that his testimony tainted the entire trial.

Affirmed.

CORBIN, THORNTON, and HANNAH, JJ., dissent.

JIM HANNAH, Justice, dissenting. I must respectfully dissent because the majority affirms liability for negligence in the absence of any evidence that Coca-Cola was negligent. The majority's analysis of liability appears to be an application of a hybrid of strict liability, the doctrine of *res ipsa loquitur*, and general negligence.

Liability may not be based simply upon the existence of an injury. The majority appears to believe that Fred Gill's injuries could have been avoided simply by the inexpensive addition of a redundant grounding system. That may be true, but that is not how this case was pled, or tried, and further, no credible or admissible evidence exists in this case to show Coca-Cola was under a duty to provide a redundant grounding system.

This case against Coca-Cola was based in negligence and lacks substantial evidence of proximate cause. The case also fails for a lack of proof of a duty. I also must dissent from the holding that a pleading withdrawn by nonsuit is not admissible against the nonsuiting party for purposes of impeachment. A pleading withdrawn by nonsuit is no less credible than a pleading withdrawn for some other purpose.

*Facts*

There is no dispute that Gill was seriously injured when he suffered the electrical shock. Gill was asked to set up the trailer by Principal Steve Daniel. Gill had previously performed this task. Daniel testified he plugged in the electrical cord in the shed after Gill fed the cord out a hole in the trailer. According to Daniel's testimony, he later saw Gill, sensed Gill was in trouble, and went to his aid. By the time Daniel reached Gill, Gill was propped up against the trailer. Daniel testified that he was knocked on the ground by a shock when he touched Gill. Daniel then testified

that he touched the trailer and was again shocked, and he then unplugged the electrical cord. The evidence is that the electrical wiring in the shed was in very poor condition, did not meet code, and the that circuit used for the trailer was not grounded.

We know that Gill was shocked by current flowing from the trailer through him and into the ground. There is no evidence to show that the current could have come from anywhere but the cord plugged in by Daniel in the high school shed. However, there is no evidence of how the current was passed to the trailer body. There was no credible or admissible evidence to show that the electricity passed from the cord to the trailer body or that the electricity passed by some other means into the trailer body. The Gills did not plead or argue *res ipsa loquitur*. Neither *res ipsa loquitur* nor strict liability is applicable. Thus, the Gills had to prove what caused the electrical shock, but they did not do so.

*Duty*

The majority states that the question is not whether a defendant could have reasonably foreseen the exact or precise harm that occurred, or the specific harm, but rather it is only necessary that the defendant be able to reasonably foresee an appreciable risk of harm to others. The majority then states that Gill, as well as members of the public would be expected to come in contact with the trailer. That is all true and a correct statement of the law. However, the majority then states that there was evidence that Coca-Cola had changed the power cord from a two Plug 50 amp to a 15 amp cord. The majority does not state when that change was made or how it has any impact in this case. The majority then concludes:

> As in *Jordan*, where the defendant's asserted lack of knowledge of the contents of the purse that he tossed across a crowded room did not exempt him from owing a duty of ordinary care to the patrons of the bar, Coca-Cola's lack of knowledge that Fordyce High School's electrical outlet in the shed was defectively grounded does not defeat its duty, under these facts, to take ordinary, prudent precautions to protect Mr. Gill, including an auxiliary grounding system. Not only did Coca-Cola fail to install an

auxiliary grounding system for the trailer, but it failed to test the grounding system in the shed to assure that it was operational.

The majority's reliance on *Jordan v. Adams*, 259 Ark. 407, 533 S.W.2d 210 (1976) is misplaced. In *Jordan*, this court found that it was a culpably negligent act to throw a purse 26 feet across an area where people were dining and drinking. The court also noted that Jordan had known his girlfriend for a year, and that he knew she often carried a pistol. Therefore, the jury could conclude Jordan was aware the purse might well contain a pistol. This court then went on to say that it was foreseeable that an injury might result from throwing the purse, and it noted that glasses were broken. The issue in *Jordan* was foreseeability, and this court concluded that injury from throwing the purse was foreseeable and that the tortfeasor need not foresee the exact manner of injury.

Apparently, *Jordan* is cited for the proposition that for liability to attach, it is only necessary that the tortfeasor foresee an appreciable risk of harm to others by his or her action. Thus, in the present case, the majority holds that providing the trailer was a negligent act and that the exact manner in which the electricity made its way into the trailer body need not be shown. In *Jordan*, there was a negligent act in throwing the purse. In the present case, there is no negligent act in providing the trailer. Trailers had been provided for many years. What the majority is really holding is that the trailer was a dangerous instrumentality and providing the trailer subjected Coca-Cola to strict liability. That theory was not pled or tried.

Although couched in terms of negligence, the majority actually applies strict liability. The majority wants Coca-Cola to be liable for injuries arising from the use of a dangerous instrumentality. There is a duty on the part of a person in charge of a dangerous instrumentality to protect against the danger if the person knew or should have known of the danger. *Benson v. Schuler Drilling Co.*, 316 Ark. 101, 871 S.W.2d 552 (1994). *Black's Law Dictionary* notes that a dangerous instrumentality may serve as the basis for strict liability where an instrument is:

> so inherently dangerous that it may cause serious bodily injury or death without human use or interference.

*Black's Law Dictionary*, 399 (7th ed. 1999). There is no doubt that the shed may have posed such a danger. The circuit that supplied the electricity to the trailer was ungrounded. Anyone touching an outlet in that circuit stood a danger of suffering injury. However, the trailer cannot be a dangerous instrumentality on its own. It took human involvement to bring about the injury. The trailer had to be plugged into the defective shed before the electricity found its way into the trailer. To hold, as the majority does, that the duty to provide ordinary care required testing the shed and supplying a redundant grounding system without any evidence that to failing to do so breached the standard of care in the industry is to apply strict liability. Strict liability is inapplicable in this case.

### Negligence

Liability in this case was based upon negligence. To prove negligence in Arkansas, the plaintiff must show a failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances. *Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349 (1997). The plaintiff must also show that he or she suffered damages proximately caused by the defendant's negligence. *Callahan v. Clark*, 321 Ark. 376, 901 S.W.2d 842 (1995). Underlying negligence is the broad principle of law that states that where there is fault there is liability, but where there is no fault there is no liability. *Missouri Pacific R.R. Co. v. Horner*, 179 Ark. 321, 15 S.W.2d 994 (1929); *Choctaw, O. & G. R. Co. v. Jones*, 77 Ark. 367, 92 S.W. 244 (1906). Long ago in *Missouri Pacific*, this court stated:

> There are many injuries to persons and property for which the law furnishes no redress, and proof of injury alone, without proof of negligence causing the injury, does not entitle one to recover. One is entitled to recover for negligence only when the negligence complained of causes the injury.

*Missouri Pacific*, 179 Ark. at 325.

Two acts of negligence are alleged. The first relates to the cord. The second relates to a back-up grounding system. In asserting both alleged acts of negligence, the Gills rely upon the testimony of Jimmy Clark as an expert witness and as a lay witness.

The Gills rely heavily on Clark's testimony in attempting to establish the alleged negligent act in supplying a defective cord. They also rely upon Clark to establish that providing a trailer with a defective cord would be a negligent act. That may be an appropriate question for an expert on electricity. However, the Gills also rely on Clark's testimony to establish that the cord was defective, which is nothing more than speculation. Clark had no knowledge of the trailer or the cord at the time of the injury.

An examination of Clark's testimony makes it immediately clear that he has utterly no evidence to offer on the state of the cord or trailer at the time Gill suffered the electrical shock. Clark did not see the trailer while it was still at the school and cannot offer any testimony as to its condition at the time of the injury. Clark could testify as to the condition at the time he later saw the trailer. The only testimony with regard to the condition of the cord at the time of the injury came from Edward McMillan, the electrician called to the scene by Fordyce High School. Mr. Macmillan testified that he examined the cord and tested it, finding there was no problem. The next best testimony to Mr. Macmillan's testimony was the testimony of James Jordan of Coca-Cola's maintenance crew. Jordan's testimony was that cords in the trailers were changed when needed, and the cord in trailer #308 might have been changed at some time, but there was no testimony that it was changed, or most significantly, what the condition of the cord was on the day of the accident.

Clark only saw the trailer later, and based upon his observation of the cord, he concluded that the cord appeared new. Because he concluded the cord was new, Clark then concluded the cord had been changed after the accident. There was no evidence to show that the cord was changed after the accident. However, because Clark speculated that the cord was new, he then speculated further that the cord caused the accident. Clark's testimony is obviously nothing more than his musings about what likely happened. That is not evidence of anything. He stated:

> My feeling was at the time, and of course I said that nobody can tell for sure, but my feeling at the time that it most probably, and I said it at deposition that it was 95% probable that it was the cord. That something in the cord—those cords are run over by

vehicles and if they're old and have been smashed a number of times, the insulation in them is going to give way.

Clark's testimony amounts to nothing more than assumptions based upon assumptions. He assumes that the cord was replaced where there are no facts showing that the cord was replaced after the accident. He assumes that the reason the cord was replaced was because it was old. Clark then further assumes that the old cord was frayed, and that it had been run over by vehicles and damaged. Clark in addition then assumes that the old cord was frayed to the point that the wires were uninsulated and bare. He then finally assumes those bare wires made contact with the trailer charging the trailer body with electricity. There is no evidence to support any of these conclusions. The evidence was the trailer body was charged when Gill touched it and suffered an electrical shock. There was no evidence of how the trailer body became charged with electricity. To the contrary, Macmillan, who was the only witness who examined the cord at the scene, testified that the cord was not defective. That is the only real evidence on the condition of the cord. The directed–verdict motion should have been granted on this issue rather than forcing the jury to impermissibly decide whether to accept Macmillan's testimony on the condition of the cord or Clark's speculation. A jury verdict may not be based on speculation. *First Elec. Coop. Corp. v. Pinon*, 277 Ark. 424, 642 S.W.2d 301 (1982).

Nonetheless, the majority buys into this rank speculation stating that Clark "went on to testify as an expert witness who was qualified by virtue of his experience, that the old cord might have been damaged and that this might have caused the electrical short to the trailer." Twice, the majority uses the word "might" in one sentence. That the majority is compelled to use "might" simply confirms that Clark's testimony is nothing more than inadmissible conjecture. What underlies the majority's opinion is the assumption that because the trailer belonged to Coca–Cola, and was provided by Coca–Cola, it is more likely that Coca–Cola was responsible for the condition that caused the trailer body to be charged with electricity than it was that Gill was responsible for the condition. In its reasoning, the majority slides into the temptation to apply "the thing speaks for itself doctrine." *See Gain v.*

*Parker*, 315 Ark. 107, 112, 865 S.W.2d 282 (1993). This is the *res ipsa loquitur* doctrine. *Res ipsa loquitur* was not pled or argued in this case.

However, a discussion of *res ipsa loquitur* also shows that the majority is in error because the doctrine supplies the sort of inference the majority stretches to find. The presumption supplied by *res ipsa loquitur* is limited to situations where the defendant's negligence has been substantially proven. *Barker v. Clark*, 343 Ark. 8, 33 S.W.3d 476 (2000). *See also Coca-Cola Bottling Co. v. Hicks*, 215 Ark. 803, 223 S.W.2d 762 (1949). Though not stated, the majority opinion assumes the negligence of Coca-Cola was substantially proven simply because they provided the trailer. The argument under *res ipsa loquitur* would be that Coca-Cola's liability is substantially proven because it would be most likely that Coca-Cola created whatever condition existed in the trailer that caused it to be charged. However, in this case, the thing does not speak for itself. To apply the doctrine of *res ipsa loquitur*, the event must be one which ordinarily does not occur in the absence of negligence, and one where all other possible causes of injury such as the conduct of the plaintiff or others are sufficiently eliminated. *Gain, supra*. To meet the requirements of *res ipsa loquitur*, the instrumentality, in this case the charged trailer, must be in the exclusive possession and control of the defendant. *Barker, supra*. That was not the case here where the trailer was delivered to the high school and Gill and others were setting up the trailer. Negligence had to be proven, and it was not.

The Gills offered no credible evidence of how the trailer body became charged. Macmillan testified that his examination and testing of the cord at the scene revealed no problems. The cord supplied the electricity to the trailer, but that alone does not mean that the cord itself charged the trailer body. The trailer body might have been charged by something Gill brought inside the trailer and plugged in that belonged to the school district. Was the district using hot plates or other electrical appliances? Was Gill using a drill motor in setting up the trailer? Did Gill make modifications to the set up inside the trailer? Gill might have done something in setting up the trailer that brought some electrical wire other than the cord in contact with the trailer body.

The majority seems to conclude that somehow unfounded speculation by experts can magically coalesce to constitute substantial evidence proving that a short in the cord was the cause of the accident. The testimony provided by experts, such as Clark's testimony that there was a 100% possibility of a short in the cord that he never examined, Peter Reynold's testimony that the cord was the weakest point in electrical equipment, and Lonnie Buie's testimony that the cord could undergo significant wear and tear simply supply possibilities, but do not constitute admissible evidence. The only credible evidence was that of Macmillan's testimony that in testing and examining the cord, he found no problems.

Surely justice ought not be meted out based on percentage chances, but that is precisely what was done in this case. Clark's testimony given the greatest leeway possible amounts to nothing more than Clark's subjective guess on what might have been the most likely cause, and that guess is directly contrary to the only credible evidence provide by Macmillan that there was no problem with the cord. Clark offered no credible evidence of the condition of the cord or evidence that the trailer body was charged by the cord. The Gills offered no evidence on how the trailer body became charged. The trial court erred first in admitting Clark's testimony over the objection that Clark could only speculate on the condition of the cord. The trial court then erred again in failing to grant a directed verdict. The evidence in this case simply does not support the jury's verdict. As this court stated in *First Elec. Coop.*:

> Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof. *Glidwell, Adm'r. v. Arkhola Sand & Gravel Co.*, 212 Ark. 838, 208 S.W.2d 4 (1948). We stated in *Kapp v. Sullivan Chevrolet Co.*, 234 Ark. 395, 353 S.W.2d 5 (1962), that judgments based on speculation and conjecture will not be allowed to stand.

*First Elec. Coop.*, 277 Ark. at 428-29. Conjecture and speculation is precisely what underlies the verdict in this case.

To state that Clark's qualifications to testify on the issue of the cord and redundant grounding systems were dubious is an

understatement. In *Farm Bureau Mutual Insurance. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), this court stated:

> In *Daubert*, 509 U.S. 579, the petitioners urged the Court to dispose of the test established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which provided that "expert opinion based on a scientific technique is inadmissible unless the technique is 'generally accepted' as reliable in the relevant scientific community." 509 U.S. at 584. They contended that the *Frye* test had been superseded by the adoption of the Federal Rules of Evidence. The Court agreed and established the following inquiry to be conducted by the trial court:
>
>> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
>
> *Id.* at 592-93 (footnotes omitted).

*Farm Bureau*, 341 Ark. at 115-16. The trial court did not apply the above requirements in the present case. Rather, the trial court concluded simply that Clark was current in his field. It is unclear what Clark's field was. Clark was some sort of electrical person within the structure of Alcoa, but what that translates to in the outside world was never made clear. It is likely Clark was qualified to testify as an expert in some limited regard, perhaps with regard to electrical practices at Alcoa in the 1960's, but he should not have been allowed free license to speculate as he was in this case.

The majority notes that Clark expressed opinions on conductivity and grounding. Clark characterized the issues in this case as "elementary." He also stated, "It's such a simple matter." Yet his opinions were not based in fact. The injury done to the credibility of the trial by the introduction of Clark's speculation and assumptions based upon assumptions so outweighs any slight value of his testimony on conductivity and grounding as to make

his presence prejudicial to the trial. That metal and human beings conduct electricity is such common knowledge that it is difficult to see·how expert testimony is required on the subject. Injury by electrical shock has been a subject in the decisions of this court for many, many years. *See Presley v. Actus Coal Co.*, 172 Ark. 498, 289 S.W. 474 (1927). As a matter of common experience and knowledge the average person knows that what is in a light socket can kill. Grounding is also hardly a novel concept. The question is whether the untrained layman would be qualified to intelligently determine the issue. *Maxwell v. State*, 279 Ark. 423, 652 S.W.2d 31 (1983).

Had Clark been qualified to testify about the standard of care in use and maintenance of the type of trailer at issue, or had he been able to offer testimony about the standard of care in the industry regarding use of redundant grounding in trailers of this sort, he might have been helpful. He offered only his subjective opinions about what would be safe, not what the standard was.

An expert is presented to a jury as someone the jury can trust and rely on, someone who has more knowledge than the jury does. However, as this court has stated, where an expert is allowed to draw an inference the jury should make, or in this case to provide speculation in lieu of evidence, the jury is presented information "gift-wrapped with the fabric of expert scientific opinion." *Maxwell, supra*. That is what was done in this case. The jury was not presented with evidence that Gill suffered the electrical shock because of a defect in the cord, but rather was presented with unfounded speculation by an expert that cast no light on how the trailer body came to be charged with electricity. That the jury relied upon Clark and returned a verdict against Coca-Cola is hardly surprising.

Clark's opinions on secondary grounding systems are no more credible than his testimony on the cord. Clark has not been employed in a field remotely involving electricity in over thirty years. Even when he was employed, his position was not one that required he be a licensed electrician. In negligence, an expert is expected to provide the jury with information on the standard of care in the industry. *See Nationsbank v. Murray Guard*, 343 Ark.

437, 36 S.W.3d 291 (2001). In the context of this case, Clark would be expected to inform the jury of what other in the industry do with respect to redundant grounding. No such evidence was supplied. The question was whether Coca-Cola was behaving as a reasonably careful person would do under the circumstances. *Ethyl Corp. v. Johnson*, 345 Ark. 476, 49 S.W.3d 644 (2001). The jury was not provided with evidence on this issue. Instead, the jury was told:

Q. Jimmy do you have an opinion with reference to the safety of Coca-Cola in not putting this ground on this trailer?

A. Do I have an opinion about the safety of it?

Q. Yes, sir.

A. Well, it should have been there. I mean, the ground should have been there. The ground rod and the wire from the rod over to the — to the — whatever — what do you call that what we've been talking about? Well, from this vehicle here because it had wheels on it through a wire hooked to the frame and to the ground rod, it should have been there. It was designed for it. I understand at one time they used that and they just quit using it.

Whether the trailer ever had a redundant ground was a matter of contention in the case, and as with much of his testimony, Clark conveniently concluded without any basis in fact that there had been such a system on the trailer in this case. The above testimony is not expert testimony. It provides the jury with nothing regarding standard of care in the industry. Had Clark testified that the industry does or does not use a redundant grounding system as a standard, his opinion might have been helpful. Rather, his opinion is merely a personal opinion by Clark that it would have been safer with a redundant grounding system. If Clark concluded one redundant system made it safer, presumably he would have opined that a second redundant grounding system would make it even safer and guard against someone pulling up or running over the first redundant system. Ten redundant grounding systems would obviously increase safety even more, but the question is whether Coca-Cola was negligent and Clark's opinions on redundant grounding do not cast any light on negligence.

The trial court erred in allowing Clark to testify over objection about issues of which he knew nothing.

### Waymatic Crossclaim

I also must respectfully disagree with the majority's holding that a pleading is exempted from use in impeachment where the action was nonsuited. The majority cites *Belz-Burrows, L.P. v. Cameron Construction. Co.*, 78 Ark. App. 84, 78 S.W.3d 126 (2002), as a case it looks to in determining that allegations in pleadings that were nonsuited may not be used for impeachment. I must note that the court of appeals stated:

> However, there is a significant difference between the admissibility of a withdrawn pleading and the admissibility of the fact that a nonsuit was taken. The admissibility of a withdrawn pleading rests on the fact that it is considered an admission and is inconsistent with the present position of the party who filed it. When a party states a fact in a pleading, he is averring that it is true; therefore, if at trial he takes a position contrary to the one taken in the pleading, a clear inconsistency is revealed. The same reasoning does not necessarily apply to the taking of a nonsuit. Unlike a pleading, a nonsuit is not defined by its content; it does not necessarily express a statement or assert a position. A pleader who takes a nonsuit does not necessarily admit that his suit has no basis; rather, a nonsuit is often taken for other reasons, such as settlement or trial strategy.

*Belz-Burrows*, 78 Ark. App. at 91–92. What was at issue in *Belz-Burrows* was whether the fact that there had been a nonsuit could be used to infer the claim was dropped because there was no merit to the claim. Admission of a pleading was not at issue. It is by a pleading that the party is impeached. The court of appeals decision provides simply that the fact a nonsuit has been taken does not necessarily imply anything about a position taken as opposed to a pleading which is an averment of the truth of what was asserted. A nonsuit may be taken for a number of reasons that have nothing to do with the validity of the claim. Therefore, the court of appeals distinguished a nonsuit from a pleading, which is correct.

In *Dodson v. Allstate Insurance. Co.,* 345 Ark. 430, 47 S.W.3d 866 (2001), this court discussed an attempt by Dodson to admit a filed and dismissed pleading of a party opponent. In *Dodson,* the court held that the pleading was admissible at trial as impeachment evidence to show that contrary to Allstate's position at trial, Allstate had earlier asserted that Dodson had been involved in wrongdoing. Similarly in the present case, Coca-Cola wishes to use a pleading that was effectually withdrawn by a nonsuit to show that a party is now taking a different position than earlier, and that the pleading is admissible impeachment evidence under Ark. R. Evid. 613 (2002).

*Belz-Burrows* is not on point. The majority asserts that no authority is cited by Coca-Cola in support of its assertion it should be able to use nonsuited allegations for impeachment. The majority states it is aware of no supporting authority. The majority need look no further than *Dodson,* which stands for the proposition that withdrawn pleadings are admissible for purposes of impeachment. Coca-Cola simply attempts to impeach the Gills with a pleading as allowed under *Dodson.* There is no difference between a withdrawn pleading and a nonsuited pleading. Both include allegations that are admissible. The majority argues that allowing admission of withdrawn pleadings against settling parties may discourage settlement. Allowing a nonsuiting party to exempt its pleadings from use in trial encourages less than candid behavior. It is one thing to allow alternative pleading where a plaintiff may be unsure of just how the injury was inflicted, but it is quite another to encourage a litigant to knowingly file contradictory pleadings as a matter of strategy. It is where a plaintiff is unsure that alternative pleading is proper. *See e.g., George v. Jefferson Hosp. Ass'n.,* 337 Ark. 206, 987 S.W.2d 710 (1999).

I would reverse and remand.

CORBIN and THORNTON, JJ., join this dissent.