George M. CALLAHAN et al. *v.* Mary Ellen CLARK

94-1361                                      901 S.W.2d 842

Supreme Court of Arkansas
Opinion delivered July 17, 1995

*Wright, Lindsey & Jennings*, by: *James M. Moody* and T*roy A. Price*, for appellants.

*Sloan, Rubens & Peeples*, by: *Kent J. Rubens* and *Timothy O. Dudley*, for appellee.

JACK HOLT, JR., Chief Justice. This is a legal malpractice case arising out of appellant George Callahan's representation of appellee Mary Ellen Clark in a divorce action. The case was submitted on interrogatories, whereby the jury concluded that Mr. Callahan was negligent in failing to determine the value of the marital business, setting damages at $120,000.00, and in advising Ms. Clark to sign the property settlement agreement awarding damages of $248,000.00 in this regard. The trial court entered judgment against Mr. Callahan and his law firm accordingly.

Mr. Callahan and his law firm appeal, asserting four specific points of error: (1) that the jury's award of $248,000 for negligence was based on conjecture and speculation, rather than on the required substantial evidence of damages flowing from specific breaches; (2) that the jury's award of $120,000 for negligent failure to value marital assets could only have been based on conjecture and speculation since the jury did not and could

not have found that the court would have awarded such an amount; (3) that the trial court erred in allowing Ms. Clark's trial counsel to taint the proceedings below with unfairly prejudicial evidence of a supposed ethical violation by Mr. Callahan; and (4) that the trial court erred in refusing to allow Mr. Callahan to introduce evidence that Ms. Clark eventually lost custody of her children, the threat of which strongly bore on her inclination to sign the property settlement agreement. None of these arguments has merit. We affirm.

*Facts*

In March of 1989, appellee Mary Ellen Clark hired appellant George Callahan, an attorney with the firm of Callahan, Crow, Bachelor, and Newell of Hot Springs, to obtain what she thought would be an uncontested divorce from her husband, Harvey Clark, to whom she had been married for over eight years. When Ms. Clark first met with Mr. Callahan, she outlined her objectives in the divorce as follows: (1) that she receive custody of the couple's four children; (2) that she retain some role in operation of their business, Clark Industries, Inc., which produced replacement parts for classic cars, and which was operated out of a "shop" building on a small piece of land adjacent to the marital residence; and (3) that she obtain a steady income for herself and her children.

Shortly after Ms. Clark's initial meeting with Mr. Callahan, the divorce proceedings became bitterly contested. Mr. Clark sought custody of the children, and the business became the subject of much disagreement. Particularly, the Clarks accused each other of draining business assets and improperly using business funds, and the Internal Revenue Service ultimately imposed a tax lien on the business, with the Clarks facing personal liability for failure to withhold payroll taxes. Thereafter, the chancellor appointed Robert Ridgeway, an attorney who had previously represented the Clarks, as a special master to oversee Clark Industries.

Following the exchange of several drafts, the Clarks executed a settlement agreement in January of 1990 relating to both custody and division of their marital property. Ms. Clark was awarded custody of the children, and Mr. Clark agreed to pay $1200 per month in child support. Although Ms. Clark was no

longer living there, she became the owner of the marital residence and the land on which the shop was located. Mr. Clark was permitted to continue to operate the business, but was required to pay Ms. Clark $3000 per month in rent for a period of five years for use of the property. In turn, Ms. Clark agreed to transfer all of her stock in the business to Mr. Clark, who, upon execution of the agreement, paid Ms. Clark $10,000 cash, $3000 in vacation pay, and $2766.33 in reimbursement for sums Ms. Clark had advanced to the business. Additionally, Mr. Clark paid $10,000 toward Mr. Callahan's attorney's fees, and agreed to assume full responsibility for the outstanding taxes reflected in the tax lien.

The property settlement agreement contained provisions that imposed responsibilities and risks on both parties, which included the condition that if Ms. Clark defaulted on the mortgage payments for either the marital residence or the shop, Mr. Clark could reclaim and obtain ownership of both pieces of property by paying the overdue payments and attorneys fees or costs. Conversely, if Mr. Clark defaulted on any of his required payments, Ms. Clark was given the right to reenter the premises of the business and to attach and sell all corporate assets.

In May of 1990, some four months after executing the settlement agreement, the bank note on the shop property became due and Mr. Clark refused to sign an extension of the note; thus, Ms. Clark was unable to refinance her loan. The bank initiated foreclosure proceedings, and Mr. Clark exercised his right under the agreement to reclaim the house and shop, and terminated the $3000 per month lease payments to Ms. Clark. Thereafter, Ms. Clark filed an action for malpractice against Mr. Callahan and his law firm, alleging, among other things, that he was negligent both in failing to have Clark Industries valued, and in advising her to sign the property settlement agreement. She amended her complaint to include Robert Ridgeway, the special master, as a separate defendant, but the trial court later dismissed Mr. Ridgeway upon Ms. Clark's motion.

The case proceeded to trial. Ms. Clark's first witness was the appellant, Mr. Callahan, who stated that he had been practicing law for 26 years. In order to value Clark Industries, he examined four to five years of tax returns, financials that Ms. Clark and Elaine Simpson, Ms. Clark's sister and part-time bookkeeper

for Clark Industries, had provided to him, and the master's full reports containing accounts receivable and accounts payable information. In addition to reviewing these documents, Mr. Callahan walked through the business and looked at the equipment, and telephoned Ron Reagan, the owner of Chemfab, a similar business which manufactured aircraft parts, who advised him that liquidation of Clark Industries would not be in Ms. Clark's best interests.

As it was his understanding that custody was Ms. Clark's top priority, Mr. Callahan stated that he knew she would have to make some concessions with regard to the business, recognizing that the Clarks could not jointly operate the business, and that its real value was the genius of Mr. Clark, who had the contacts and identified the market. According to Mr. Callahan, he was able to give Mr. Clark much of the marital debt in the agreement, and obtained for Ms. Clark substantial hard assets — the real estate, home, building, and other personal property. Mr. Callahan testified that he explained to Ms. Clark that pursuant to the agreement, both parties ran substantial risks; however, he stated that he did not know that the bank would not let the $24,000 note on the shop be refinanced unless both parties signed it, and that he did not check with the bank as to whether Mr. Clark's signature would be required. He explained that there was never any presumption that Mr. Clark would be responsible for the note, as Ms. Clark had told him that she would not go back to One Bank, who had the note, as she did not like their rate of interest. According to Mr. Callahan, Ms. Clark "constantly reassured" him that she would be able to refinance the note and deal with the risk.

Patty Ann Lueken, a licensed attorney since 1989, testified as an expert witness on behalf of Ms. Clark, stating that 50 percent of her practice was devoted to domestic relations cases. She reviewed the files in the case, and offered her opinion that, a deposition or set of interrogatories would have been very helpful in order to value Clark Industries. Particularly, she stated that she would have taken Mr. Clark's deposition in order to determine what he thought the value of the company was, and would have used his deposition as a negotiating tool. It was Ms. Lueken's opinion that it was necessary to get an expert as to the value of the business in the case, and that Mr. Callahan failed to meet the applicable standard of care in his representation of Ms. Clark.

According to Ms. Lueken, paragraph 19, the default provision of the property settlement agreement, put Ms. Clark in a terrible position in that if she could not renew the note on the shop in May of 1990, she ended up with nothing, with the exception of a party barge, a Bronco, and some other personal items. This provision reads as follows:

> In the event that the Wife defaults on the mortgage payment for either the home or the shop building note or notes, the Husband has the right to buy back the home, the land the home is situated on, the shop building and the land that the shop building is situated on by paying only the back payments owed at that time plus attorney's fees or other costs in order to bring the note or notes current. The default by the Wife on these payments is agreed by the parties to be defined as late payments sufficient to necessitate legal action by the filing of a Complaint for Foreclosure in order to collect these past due amounts by an attorney.

It was Ms. Lueken's opinion that Mr. Callahan, in advising Ms. Clark to sign this agreement containing this provision, should have been aware of what liabilities Ms. Clark had, as his file clearly showed that she was not going to be able to renew the note, as it reflected that some of her credit cards had been cut off, the Bronco payment was behind, and that there were IRS liens for which she was partially responsible. According to Ms. Lueken, this provision provided that, in the event that Ms. Clark defaulted, Mr. Clark would get whatever was left over after foreclosure, without having to pay any of the equity in the shop or the remaining portion of the $180,000 lease payment to Ms. Clark. Moreover, the lease payment, Ms. Lueken stated, would actually be paid by Clark Industries, which was owned by Mr. Clark. After costs, Ms. Lueken estimated that Mr. Clark would receive an additional $70,000 to $80,000 as a result of this provision.

Philip Dixon, a licensed attorney since 1960 with 60 to 70 percent of his practice devoted to domestic relations, testified out of turn as an expert witness on behalf of Mr. Callahan. It was his opinion, after reviewing the files in the case, that Mr. Callahan met the applicable standard of care and performed the due diligence that was required of him in the representation of Ms.

Clark. It was Mr. Dixon's opinion that Mr. Callahan had more discovery and more information available to him overall than many attorneys get throughout a lawsuit, specifically referring to the reports of the master. He testified that he had reviewed the deposition of Dr. Ralph Scott, Ms. Clark's economist, and that he disagreed with his assumptions made in arriving at his figures. Particularly, he stated that Dr. Scott assumed that both parties could walk away from the business and still continue to have an income stream of $100,000.

Regarding paragraph 19 of the agreement, Mr. Dixon stated that he was aware that Ms. Lueken had criticized Mr. Callahan for not having Mr. Clark personally guarantee the lease agreement, or in not having him agree in writing to help Ms. Clark renew the note. It was Mr. Dixon's opinion that, as Mr. Callahan had stated that he had counseled Ms. Clark regarding her debts and that she assured him that she had the means to take care of the situation, Mr. Callahan's conduct in advising Ms. Clark to sign the property settlement agreement, which included the provision in paragraph 19, was reasonable under the circumstances. On cross-examination, however, Mr. Dixon stated that he had never seen a default provision like the one in paragraph 19 of the agreement.

Elaine Simpson testified on her sister's behalf, as she had done some bookkeeping at Clark Industries. She stated that she was present at a few meetings between Ms. Clark and Mr. Callahan, and that she had given Mr. Callahan a note reading, "If we do not have someone do a current inventory of assets currently at this plant, Mary will lose thousands of dollars as this list doesn't include the hundreds of dies nor a large portion of tools in the tool and die shop. These are high dollar values." Ms. Simpson further stated that she did not receive a response to her note; rather, Mr. Callahan repeatedly requested her sister to make lists. At one meeting for settlement negotiations, Ms. Simpson claimed that there was a discussion as to whether Mr. Clark would be required to sign the renewal note for the shop when it came up at One Bank in May of 1990. According to Ms. Simpson, Mr. Clark, who was present at the meeting with his attorney, agreed to keep his name on the note for five years.

Mary Clark testified as to her involvement in Clark Industries, stating that she talked to Mr. Callahan numerous times

about obtaining an inventory of the business. It was her testimony that she did not want to sign the agreement with the default provisions in paragraph 19, but that Mr. Callahan insisted that it had to be there without explaining why. She further testified that Mr. Callahan knew that Mr. Clark's name had to remain on the note for the shop, and that Mr. Callahan assured her that paragraph 30 of the agreement obligated Mr. Clark to sign the extension in May of 1990. Paragraph 30 states as follows:

> That each of the parties agree to cooperate with the other in executing such instruments as shall be necessary to perform the agreements herein contained, and each of the parties do hereby bind themselves and their respective personal representatives, heirs and assigns to perform and keep the agreements herein contained.

In May of 1990, when Mr. Clark refused to sign the extension agreement, Ms. Clark stated that she tried to extend it on her own with another bank, but her credit was too bad.

Over Mr. Callahan's objection, Dr. Ralph Scott, an economist, testified that he valued the business based on the year 1988, stating that it grew steadily up until that time. He calculated owner compensation at $113,000 and subtracted corporate loss of $20,735 for a total of $92,266 as a measure of the Clark's compensation. From that figure, Dr. Scott subtracted $30,000, based on a Department of Labor publication, for what it would have cost the Clarks to hire a bookkeeper, thus leaving $62,266. He used this figure to make a projection for the next 15 years, or Ms. Clark's work life expectancy, arriving at a figure of $692,297, one-half of which is $346,148. From listening to the testimony, Dr. Scott opined that one-half of the outstanding tax liability should be subtracted from this amount. He further stated that he would have arrived at a much higher figure had he factored in growth of the company and fringe benefits. He compared the business to a physician's practice, stating that it should be viewed as an asset that is going to generate income like a stock or bond.

At the close of Ms. Clark's case, Mr. Callahan made specific motions for directed verdict based on lack of competent evidence that any act or omission on his part proximately caused damages, and on lack of competent evidence from which the jury

could reach a verdict without speculation as to how a chancellor could effect a remedy which would have entitled Ms. Clark to one half of the business. The trial court denied both motions, and Mr. Callahan presented the testimony of Stephany Slagle, the attorney for Mr. Clark during the divorce proceeding, who testified as to the complexity of the case. She stated that if no agreement had been reached and the company had to be liquidated according to the usual practice in Garland County, it would have destroyed both Mr. Clark and Ms. Clark financially. She stated that there was never a meeting at which she, Ms. Simpson, Mr. Clark, and Ms. Clark were present where Mr. Clark made a promise that he would renew the note in May of 1990. She stated that she would have remembered such a promise had one been made, as she would not have believed it. Ms. Slagle further opined that in August 1989, the business could not be valued without knowing what Ms. Clark had done, as she was paying for her race horses, personal vehicle, babysitters, and other things which were completely out of Mr. Clark's control. In December of 1989, according to Ms. Slagle, the business was "worth very little, if not in the hole." Like Mr. Callahan, Ms. Slagle did not hire an appraiser or anyone to make a valuation of the business.

Harvey Clark testified that by the fall of 1989, he did not think the business would break even with the debt he and Ms. Clark had. He stated that he told his wife that he would sign the note until the time the divorce was final. According to Mr. Clark, when she raised the question about his signing the note during one of the final negotiation sessions, she retracted her question, stating that she was going to refinance the note, and that she thought she might sell it. Mr. Clark testified that, had his signature on the note been proposed as a condition to the agreement, he did not think that he would sign it, stating that he would not want to secure something for his landlord.

Mr. Callahan renewed all motions and objections at the conclusion of all of the evidence, which the trial court denied. The trial court submitted separate interrogatories to the jury, from which the jury found Mr. Callahan negligent in advising Ms. Clark to sign the settlement agreement, and that she sustained damages in the amount of $248,000. Mr. Callahan appeals.

### I. Jury award for negligence

For his first allegation of error, Mr. Callahan asserts that the jury's award of $248,000 for negligence in advising Ms. Clark to sign the property settlement agreement was based on conjecture and speculation, rather than on the required substantial evidence of damages flowing from specified breaches. This amount was obviously predicated on the $3000 per month lease payments Ms. Clark lost, calculated as 60 required payments or $180,000, less ten payments made or $30,000, for a subtotal of $150,000, together with $98,000 in equity she had in the marital home, for a total of $248,000 — the exact amount of the verdict.

As Mr. Callahan appeals from the trial court's denial of his motion for directed verdict as to proof of negligence and resulting damages, he is challenging the sufficiency of the evidence. Our standard in reviewing the sufficiency of the evidence is well settled: (1) The evidence is viewed in a light most favorable to the non-moving party; (2) the jury's finding will be upheld if there is any substantial evidence to support it; and (3) substantial evidence is that of sufficient force and character to induce the mind of the factfinder past speculation and conjecture. *Quinney* v. *Pittman*, 320 Ark. 177, 895 S.W.2d 538 (1995). Moreover, to prove negligence in Arkansas, the plaintiff must show that he or she suffered damages proximately caused by the defendant's negligence. *Vanderford* v. *Penix*, 39 F.3d 209 (8th Cir. 1994), *citing Arkansas Kraft* v. *Cottrell*, 313 Ark. 465, 855 S.W.2d 333 (1993). To show damages and proximate cause in a legal malpractice action, the plaintiff must show that but for the alleged negligence, the result would have been different in the underlying action. *Vanderford* v. *Penix, supra.* In Arkansas, an attorney is negligent if he fails to exercise reasonable diligence and skill on behalf of his client. *Id., citing Arkansas Kraft* v. *Cottrell, supra, Welder* v. *Mercer,* 247 Ark. 999, 448 S.W.2d 952 (1970).

In support of his argument that Ms. Clark failed to prove that Mr. Clark would have agreed to a more favorable settlement, or that litigation to judgment would have yielded a better result, Mr. Callahan relies in part on the following passage from Roger E. Mallen's and Jeffrey M. Smith's recent treatise on attorney malpractice, in which they state as follows:

> Assuming a cause of action [for negligent settlement]

can be stated, the client must not only establish that concluding such a settlement fell outside the standard of care, but also what would have been a reasonable settlement and that such sum would have been agreed to and collectible.

In evaluating and recommending a settlement, the attorney has broad discretion and is not liable for a mere error in judgment.

Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 24.36 at 521 (1989). However, Mallen and Smith also speak on speculative damages as follows:

The general rule is that an attorney is not liable for any damages which are remote or speculative. The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but rather the more basic question of *whether there are identifiable damages . . . No one can precisely say what the plaintiff lost or should have lost in such situations, but difficulty or imprecision in calculating damages does not exculpate the attorney. Even though damages cannot be calculated precisely, they can be estimated. Otherwise, attorneys could avoid liability merely because damages are difficult to measure.*

Mallen & Smith, § 16.3 at 894-895 (1989). (Emphasis added.)

In reviewing the evidence before us, we ascertain that sufficient facts existed by which the jury could find evidence of negligence, and from which the jury could identify and assess damages which were not remote or speculative. As such, a final resolve of this case hinged on which witnesses the jury chose to believe.

We have long stated that it is the province of the jury to weigh the credibility of the witnesses. *Quinney* v. *Pittman, supra.* As such, the jury was free to believe the testimony of Ms. Clark and her sister, Ms. Simpson, over that of the other witnesses, that Mr. Callahan assured Ms. Clark that the agreement required Mr. Clark to extend the note in May of 1990 and beyond, and that Mr. Clark had verbally agreed to sign the extension. In light of Ms. Lueken's testimony that Mr. Callahan should have included a provision in paragraph 19 that Mr. Clark either personally guarantee the lease agreement, or that he agree in writ-

ing to help Ms. Clark renew the note, the jury could have reasonably concluded that either a guarantee or an agreement to help renew the note should have been made a part of the contract. There was also testimony from Ms. Lueken that Mr. Callahan should have been aware of what liabilities Ms. Clark had, as his file clearly showed that, due to her numerous expenses, she was not going to be able to renew the note. Even Mr. Dixon, Mr. Callahan's own expert, testified that in his 35 years of practice, he had never seen a default provision like the one in paragraph 19 of the settlement agreement, which operated in Mr. Ciark's favor when Ms. Clark defaulted on the shop note.

As Ms. Clark correctly states in her brief, her damages were indeed identifiable, for her default was a result of Mr. Clark not being required to sign the renewal on the shop note. As mentioned previously, Ms. Clark lost $150,000 in lease payments and $98,000 in equity she had in the marital home totally $248,000, the amount of the jury verdict. Under these circumstances, we cannot say that the trial court erred in failing to direct a verdict in Mr. Callahan's favor, as there was substantial evidence to support both the jury's finding on interrogatories that Mr. Callahan was negligent in advising Ms. Clark to sign the property settlement agreement, and that Ms. Clark sustained damages in the amount of $248,000.

## II. Failure to value business

For his second argument on appeal, Mr. Callahan asserts that the jury's award for $120,000 for negligent failure to value marital assets could have only been based on conjecture and speculation, since the jury did not and could not state that the court would have awarded that amount. In his reply brief, Mr. Callahan concedes that this issue is only relevant if we hold in his favor on the first issue. As stated above, we find no merit to Mr. Callahan's first point on appeal; thus, we need not address his second argument.

## III. Ethical inquiry

Mr. Callahan further argues that the trial court erred in allowing Ms. Clark's counsel to taint the proceedings below with unfairly prejudicial evidence of a supposed ethical violation. Ms. Clark called Mr. Callahan as her first witness, and he

was questioned about a letter that he had written to her in April of 1989, in which he set a minimum fee of $2500, and stated that her divorce would not be finalized until her account with his firm was paid in full. When counsel for Ms. Clark inquired as to whether this was a proper fee arrangement, Mr. Callahan replied that "There's some disagreement about that," stating that, "There is an ethical opinion that says that if your client cannot pay you, that you must continue to represent her and to see that her rights are protected regardless of whether you are paid or not." After Mr. Callahan offered further testimony regarding his fees, counsel for Mr. Callahan made a relevancy objection, which the trial court overruled. Thereafter, the trial court admitted into evidence, over Mr. Callahan's relevancy objection, legal bills that Mr. Callahan had sent Ms. Clark, finding that the bills could be used to attack Mr. Callahan's credibility. During cross-examination of Mr. Callahan's expert, Phillip Dixon, Ms. Clark was allowed to question him, over Mr. Callahan's objection, regarding his opinion as to whether Mr. Callahan's fee arrangement was ethical. Finally, during closing argument, counsel for Ms. Clark stated as follows:

> Mr. Dixon . . . told you that the first thing [Mr. Callahan] did was unethical. He wrote a fee agreement that said, "We are not going to enter a divorce decree until you have paid all of our fee."

> Under our rules of ethics, as Mr. Dixon told you that is an unethical thing for a lawyer to do. The very first thing he did in this case, writing the fee agreement, was unethical and had to do with money.

We need not explore this issue further, as Mr. Callahan did not make a contemporaneous objection to the admission of this testimony; instead, he allowed counsel for Ms. Clark to ask some 17 additional questions before registering an objection with the trial court. A contemporaneous objection is necessary in order to preserve an issue for appellate review. *Johnson* v. *State*, 308 Ark. 7, 823 S.W.2d 800 (1992). As Mr. Callahan had offered similar testimony, Mr. Dixon's testimony on this issue was merely cumulative. We will not find prejudicial error where the evidence erroneously admitted was merely cumulative. *Williams* v. *Southwestern Bell*, 319 Ark. 626, 893 S.W.2d 770 (1995). Thus, the

admission of Mr. Dixon's testimony was harmless error. As to comments made by Ms. Clark's counsel during closing argument, we find no objection made by Mr. Callahan in the abstract or in the record. Under these circumstances, Mr. Callahan's argument is without merit.

### IV. Evidence regarding custody

Finally, Mr. Callahan asserts that the trial court erred in refusing to allow him to introduce evidence that Ms. Clark eventually lost custody of her children, the threat of which strongly bore on her inclination to sign the property settlement agreement. He contends that if the jury had been made aware of Mr. Clark's strong desire to obtain custody, "it might well have evaluated Callahan's advice in a different light."

The trial court sustained Ms. Clark's relevancy objection to this evidence, stating that it was "after the fact" evidence, and that it might lead to more rebuttal testimony. We have often stated that the trial court determines the relevancy, competency, and probative value of testimony; it is within the trial court's discretion whether to admit testimony, and its decision will not be reversed absent a manifest abuse of discretion. *Orsini* v. *Larry Moyer Trucking, Inc.*, 310 Ark. 179, 833 S.W.2d 366 (1992). As Mr. Clark obtained custody after the alleged acts of malpractice took place, we cannot conclude that the trial court abused its discretion in refusing to allow this testimony on relevancy grounds. Thus, Mr. Callahan's argument is without merit.

Affirmed.