2011 Ark. 83

**Samuel BOELLNER, M.D., and Marilyn Boellner, Appellants**

v.

**CLINICAL STUDY CENTERS, LLC; John M. Giblin, M.D.; Anthony Johnson, M.D.; and Gordon Gibson, M.D., Appellees.**

No. 10–348.

Supreme Court of Arkansas.

Feb. 24, 2011.

Rehearing Denied April 7, 2011.

Kutak Rock LLP, by: David L. Williams, Little Rock, and Katherine M. Hingten, for appellants.

Banks Law Firm, PLLC, by: Charles A. Banks, Little Rock, and Robert W. Francis, for appellees.

COURTNEY HUDSON HENRY, Justice.

Appellants Samuel Boellner, M.D., and Marilyn Boellner appeal a Pulaski County jury's verdict in favor of appellees Clinical Study Centers, LLC (CSC); Dr. John Giblin; Dr. Anthony Johnson; and Dr. Gordon Gibson. For reversal, appellants argue that substantial evidence does not support the jury's verdicts on tortious interference with business expectancy, breach of contract, defamation, and damages. Appellants also challenge the circuit court's jury instructions. On cross-appeal, appellees argue that the exemption statute for an individual retirement account (IRA), contained in Arkansas Code Annotated section 16–66–220(a)(1) (Repl.2005), conflicts with the plain language of article 9, section 2 of the Arkansas Constitution. Our jurisdiction is proper pursuant to Arkansas Supreme Court Rule 1–2(a)(1) (2010). We affirm both on direct appeal and on cross-appeal.

## I. Facts

On February 19, 1998, appellant Samuel Boellner (Boellner) founded CSC to perform drug studies or clinical trials for certain pharmaceutical companies. CSC performed these clinical trials under the authority of and oversight by the Federal Drug Administration (FDA). FDA regulations require that each clinical study be conducted by a principal investigator (PI), who agrees to conduct or supervise the study in accordance with FDA regulations and protocol. Institutional review boards (IRBs) review, approve, and monitor proposed research protocols. Under FDA regulations, an IRB must approve, monitor, and review each clinical study involving biomedical research.

From CSC's formation in 1997 until August 1, 2006, Boellner served as CSC's chief executive officer. In 2000, Gibson

joined CSC and became a fifty percent (50%) owner. On August 1, 2006, Boellner and Gibson agreed to transfer ninety-two percent (92%) of their collective ownership in CSC to Giblin, Johnson, and Bryan Jeffrey, a certified public accountant, for the sale price of $150,000. Gibson retained four percent (4%) ownership. As part of the agreement, Boellner became a consultant by contract and retained four percent (4%) ownership in CSC. Under the sale contract, Boellner received an annual consulting fee of $60,000 and additional compensation on a negotiated basis for new studies beginning July 31, 2006. In 2007, Boellner served as a PI for two studies: Arkansas IRB, which was sponsored by Abbott Laboratories, and Copernicus Group IRB, which was sponsored by Shire Pharmaceuticals.

Within two months of CSC's sale, Boellner expressed his dissatisfaction with the purchase of CSC and its new management. After January 1, 2007, CSC made no payments to Boellner for his fixed consulting fee or for his percentage of new study revenues. According to appellees' complaint, from January 2007 through June 25, 2007, Boellner engaged in a systematic pattern of conduct that included demands for personal compensation without regard for company priorities, such as rent, payroll, utilities, and salaries. Appellees alleged that their attempts to discuss financial issues brought (1) threats by Boellner to cancel studies; (2) personal calls to client sponsors; (3) absenteeism; (4) refusal to sign documents; (5) and harassment of sponsors' financial representatives, study monitors, and clinic staff. According to appellees, Boellner directed personal slurs, profanity, and insults directly toward Giblin and Johnson. Boellner's conduct allegedly continued until his termination, despite appellees' attempts to satisfy Boellner's financial demands. The parties allegedly reached a verbal agreement, but Boellner disavowed the agreement the following day. On June 25, 2007, CSC terminated its consulting agreement with Boellner. As a result of the termination, CSC informed Boellner that he no longer remained the PI on the studies monitored by Arkansas IRB or Copernicus IRB. CSC also denied Boellner access to his office and the monitoring facilities.

On that same day, Boellner sent a letter to the chairperson of Copernicus IRB, notifying the IRB of CSC's actions and that Giblin, the newly proposed PI, was "under weekly follow-up treatment for previous drug abuse." Boellner continued that, although he believed Giblin "[was] very capable as an investigator, [Boellner] question[ed] if [Giblin] should be the principal investigator on a study with a controlled substance." Subsequently, on July 3, 2007, Boellner also faxed a letter to Dr. John E. Slaven, chairperson of Arkansas IRB, with a copy to the study sponsor. In the letter, Boellner notified the IRB of CSC's actions and that Giblin, its new PI, was required by the Arkansas State Medical Board to "attend a weekly drug abuse program which he still attends and receives frequent random drug tests."

On August 6, 2007, appellees filed a complaint against appellants for breach of contract, tortious interference with business expectancy, defamation, and declaratory judgment on the parties' agreement. Specifically, appellees alleged (1) breaches of contract for a covenant not to compete, a nonsolicitation agreement, and a confidentiality agreement; (2) tortious interference with business expectancy; (3) defamation; (4) and injunctive relief. Giblin asserted a separate claim for defamation against Boellner. On September 5, 2007, appellants counterclaimed for breach of contract, wrongful termination, and declaratory judgment on the noncompete agreement.

The circuit court held a jury trial in Pulaski County Circuit Court in June 2009. During the jury-instruction conference, appellees conceded that they did not have a breach-of-contract claim against Marilyn Boellner and dropped the claim. At the conclusion of the trial, the jury returned the following awards: (1) $325,000 to appellees for breach of contract against Boellner; (2) $325,000 to appellees for tortious interference with business expectancy against appellants; (3) $325,000 in punitive damages for tortious interference with business expectancy to appellees against Boellner; (4) $75,600 in compensatory damages for defamation to Giblin against Boellner; and (5) $250,000 in punitive damages for defamation to Giblin against Boellner. The jury also returned verdicts in favor of Boellner in the amount of $403,696.04. On July 21, 2009, the circuit court entered its order reflecting these jury awards. After applying a credit toward the verdict based upon Boellner's recovery, the court awarded judgment in favor of appellees in the amount of $571,202.96. The court also entered a judgment in favor of Giblin against Boellner for a total amount of $325,600.

On August 4, 2009, appellants timely filed posttrial motions for JNOV, remittitur, and new trial, which the court orally denied from the bench on August 24, 2009. The circuit court did not enter an order within thirty days; therefore, the motions were later deemed denied. Appellants timely filed a notice of appeal on September 23, 2009.

Appellees learned, during the course of postjudgment discovery and collection proceedings, that Boellner owned an IRA valued in excess of $1.1 million at the time of the judgment. Boellner filed a brief in support of claimed exemptions, arguing that this account was exempt from collection. Appellees responded with an objection to the claimed exemption and a motion to declare Arkansas Code Annotated section 16–66–220(a)(1) unconstitutional. In their motion, appellees argued that the circuit court should not exempt the IRA because the statute is in conflict with article 9, section 2 of the Arkansas Constitution. After two hearings on the IRA exemption issue, the circuit court entered an order declaring the entire IRA account exempt based upon section 16–66–220(a)(1). On January 27, 2010, appellees timely filed a notice of cross-appeal.

## II. *Points on Appeal*

On appeal, appellants make five arguments: (1) the verdict for tortious interference with business expectancy must be reversed because the business expectancy was subject to a contingency; (2) substantial evidence did not support a verdict against appellants for breach of contract; (3) neither the amount nor the cause of damages was supported by substantial evidence; (4) the defamation verdict should be reversed because substantial truth is an absolute defense; and (5) the circuit court erred in its jury instructions. On cross-appeal, appellees argue that Arkansas Code Annotated section 16–66–220(a)(1) conflicts with the Arkansas Constitution.

Appellants appeal from the circuit court's denial of their motion for directed verdict and judgment notwithstanding the verdict as to proof of tortious interference with business expectancy, breach-of-contract claims, defamation, and resulting damages, which collectively constitute a challenge to the sufficiency of the evidence. *Conagra, Inc. v. Strother*, 340 Ark. 672, 676, 13 S.W.3d 150, 153 (2000) ("[A] motion for JNOV is technically only a renewal of the motion for a directed verdict made at the close of the evidence."). Our standard in reviewing the sufficiency of the evidence is well settled: (1) the evidence is

viewed in the light most favorable to the appellee; (2) the jury's finding will be upheld if substantial evidence supports it; and (3) substantial evidence is that of sufficient force and character to induce the mind of the fact-finder past speculation and conjecture. *Callahan v. Clark*, 321 Ark. 376, 901 S.W.2d 842 (1995).

We do not try issues of fact but examine the record to determine whether there is substantial evidence to support the jury's verdict. *Conagra*, 340 Ark. at 676, 13 S.W.3d at 152. Thus, when testing the sufficiency of the evidence on appellate review, we need only consider the testimony of appellees and evidence that is most favorable to appellees. *Wal–Mart Stores, Inc. v. Dolph*, 308 Ark. 439, 825 S.W.2d 810 (1992). We defer to the jury's resolution of the issue unless we can say there is no reasonable probability to support the appellee's version. *Wheeler Motor Co. v. Roth*, 315 Ark. 318, 867 S.W.2d 446 (1993).

### A. Tortious Interference with Business Expectancy

For the first point on appeal, appellants argue that the verdict for tortious interference with business expectancy must be reversed because the expectancy included a contingency. Specifically, appellants assert that CSC sought damages for alleged interference with six prospective clinical studies, but in one study, two documents signed by Giblin included the contingency that Shire, as the study sponsor, may "suspend or prematurely terminate the trial at any time for whatever reason," and Shire decided to terminate the clinical trial and gave written notice to CSC. Appellants contend that, because appellees' business expectancy included the contingency of early termination by Shire, no actionable claim for tortious interference lies, and the jury verdict for tortious

interference with business expectancy must be reversed.

Appellees respond that appellants' argument regarding tortious interference is barred as a matter of law because it is raised for the first time on appeal. Appellees argue that appellants failed to make this specific argument in their motion for directed verdict and in their JNOV motion.

We do not consider arguments raised for the first time on appeal. A party cannot change the grounds for an objection or motion on appeal, but is bound by the scope and nature of the arguments made at trial. *Yant v. Woods*, 353 Ark. 786, 120 S.W.3d 574 (2003). Additionally, we will not address an argument on appeal if a party has failed to obtain a ruling below. *Simpson Housing Solutions, LLC v. Hernandez*, 2009 Ark. 480, 347 S.W.3d 1.

In the present case, appellants failed to preserve this issue. At trial, appellants made their motion for directed verdict as to the tortious-interference claim, but appellants did not include the contingency argument. Rather, in their motion for directed verdict, appellants argued that Boellner was a party to the clinical studies and, because he was under a contractual duty, he could not have interfered with a contract to which he was already a party. The circuit court flatly denied appellants' directed-verdict motion without comment.

Subsequently, in a JNOV motion, appellants made a tortious-interference argument in the context of the jury's damage awards for breach of contract and for appellants' claimed interference. Specifically, appellants asserted that, contrary to appellees' position at trial, there was no evidence that appellants' actions resulted in CSC's failure to obtain profits from six proposed clinical studies, particularly when one study sponsor, Shire, elected to exercise its right to terminate the study before it began. Appellants also asserted in

their motion that substantial evidence did not support punitive damages against Marilyn Boellner for tortious interference. In response, CSC raised the argument in the context of damages and limited its argument to Marilyn Boellner's actions (*i.e.*, withholding information, aiding other studies in competition with CSC, tampering with CSC's mail, and obstructing CSC from competing in the marketplace). The circuit court never ruled on the JNOV motion in a written order, but the posttrial motions were later deemed denied.

■ We have observed that a motion for a directed verdict is a condition precedent to moving for JNOV. *Thomas v. Olson*, 364 Ark. 444, 220 S.W.3d 627 (2005). Because a motion for JNOV is technically only a renewal of the motion for a directed verdict made at the close of the evidence, it cannot assert a ground not included in the motion for a directed verdict. *Id.* Here, although appellants arguably raised the contingency argument in their JNOV motion, they failed to make the argument in their directed-verdict motion. Further, the circuit court did not rule on appellants' contingency argument. Therefore, we hold that appellants' contingency argument is not preserved for review. *See Simpson Housing Solutions, supra.*

### B. Breach of Contract

■ For the second point on appeal, appellants argue that no substantial evidence supports a verdict for breach of contract. Specifically, appellants contend that appellees failed to present substantial evidence that Boellner breached the covenant not to compete, nonsolicitation, or confidentiality agreement. Appellants further assert that Arkansas does not recognize a cause of action for breach of the covenant of good faith and fair dealing and that appellees did not plead any such claim.

Appellees respond that substantial evidence supported the judgment for breach of contract. Appellees contend that, although their complaint specifically referenced breaches of the noncompete, nonsolicitation, and confidentiality provisions, the complaint makes only one claim for breach of contract. Therefore, appellees assert that they only had to prove that Boellner breached one provision of the contract.

■ The issue presented to this court is whether there is substantial evidence that Boellner breached his contract with CSC to support the jury's verdict. When performance of a duty under a contract is contemplated, any nonperformance of that duty is a breach. *Zufari v. Architecture Plus*, 323 Ark. 411, 914 S.W.2d 756 (1996). As a general rule, the failure of one party to perform his contractual obligations releases the other party from his obligations. *Stocker v. Hall*, 269 Ark. 468, 602 S.W.2d 662 (1980). However, a relatively minor failure of performance on the part of one party does not justify the other in seeking to escape any responsibility under the terms of the contract; for one party's obligation to perform to be discharged, the other party's breach must be material. *Id.* An influential circumstance in the determination of the materiality of a failure to fully perform a contract is the extent to which the injured party will obtain the substantial benefit that she reasonably anticipated. *Id.*

Appellees alleged one general count of breach of contract, which included that

[appellants] have engaged in verbal and written communications with third-party sponsors of [appellees], threatened one or more third-party study monitors, threatened one or more of the members of the plaintiff CSC, harassed sponsors' financial representatives, planned and acted to engage in direct competi-

tion, absenteeism, and refused to sign documents. In addition, Dr. Boellner has demanded payment for work which he has not performed either by absenteeism or work that has been done in a manner inconsistent with his duties and responsibilities pursuant to a consulting agreement entered into on the 1st day of August, 2006.

Dr. and Mrs. Boellner both have engaged in behavior inconsistent with their professional responsibilities set out in the contract and, as such, have created a hostile work environment for the [appellees] and employees. All of these actions are in direct violation of the contracts between the parties . . . .

Specifically, appellees alleged a breach of the covenant not to compete, breach of the nonsolicitation agreement, and breach of the confidentiality agreement.

The parties' agreement contained provisions that CSC entered into a consulting agreement and noncompetition, nonuse, and nonsolicitation agreement (collectively "noncompetition agreements") with appellants. The consulting agreement provided that CSC would terminate the agreement if the consultant "commit[ted] an act of fraud against [CSC]; upon the disclosure of authorized confidential information by the consultant; in the event that the consultant fail[ed] to perform the services contemplated by [the] agreement with diligence or competence, or the consultant materially breache[d] this agreement." Similarly, the noncompetition agreements required the parties to enter into a covenant not to compete, to protect confidential information, and to refrain from soliciting, accepting, or engaging in any business in competition with CSC for a period of three years.

With these provisions in mind, we turn to appellants' breach-of-contract argument. At the outset, we note that the jury returned a verdict for breach of contract without specifying which particular breach occurred. We further note that the jury rendered the breach-of-contract verdict against Boellner rather than his wife.

Here, Johnson testified that "every interaction with Dr. Boellner after [Johnson's return to CSC] was either rudeness or not talking to me or him yelling at me, accusing me of not knowing what I was doing, and basically totally unwilling to work with me." According to Johnson, Boellner berated Phil Schmidt, a former CSC employee, as well. During one meeting, Boellner began to berate Johnson, who proceeded to leave the meeting. Johnson testified that, on December 7, 2006, he conducted a meeting with Boellner "[t]o come to terms on how we could move forward positively at [CSC]." However, Johnson opined that "over the next three months, the behavior, the way I was treated, the lack of ability to work together basically continued[.]" According to Johnson, Boellner agreed when he signed the consulting agreement that he would continue to bring in more studies, but according to Johnson, Boellner said, "I'm not going to do what I said I was going to do in the agreement."

Gibson testified that he worked on a clinical study with Boellner, but at a critical point during the study, Gibson realized that Boellner was out of town and believed that Boellner was attending an investigator meeting in Florida. Gibson also testified that Boellner displayed volatile behavior toward Johnson and that he overheard Boellner tell an Abbott representative that "we have a drug addict and a used car salesman running this company." Additionally, Giblin testified that Boellner repeatedly discussed quitting studies. According to Giblin, Boellner stated that Wyeth, one potential sponsor, was not in-

terested in continuing a study, but Dr. Aukstolis, a non-CSC physician, testified that he and Boellner had ongoing communications with Wyeth about Aukstolis's potential participation in the Wyeth study. Giblin also testified that Boellner informed Pfizer that CSC was not interested in performing two studies, but Giblin salvaged CSC's participation in those studies after Boellner attempted to cancel them.

Further, Schmidt testified that Boellner told a CSC customer that Giblin should not have been a PI on that particular study; that the company should not do business with CSC because Boellner was not getting paid; and that the work environment at CSC was toxic and dysfunctional. Vonnetta Hockaday, a former receptionist at CSC, testified that Boellner met with six people from Arkansas Research Solutions, one of CSC's competitors, and gave them copies of information about CSC's clinical study business. Jennifer Gentry, a nurse at CSC, testified that Boellner, at times, could be heard yelling and screaming in the clinic, and she was concerned that patients would overhear him.

Viewing this evidence in the light most favorable to appellees, we hold that substantial evidence supports the jury's verdict that Boellner materially breached his contract with CSC. This evidence particularly supports that Boellner attempted to undermine CSC's efforts in achieving clinical studies with certain companies, sabotaging CSC's business in violation of his noncompetition agreement, and failing to perform his duties with diligence and competence. Thus, we affirm the jury's verdict on this issue. Because substantial evidence supported the jury's breach-of-contract verdict, we decline to reach appellant's argument concerning appellees' allegation of a breach of an implied covenant of good faith and fair dealing.

## C. *Damages*

For the third point on appeal, appellants argue that substantial evidence does not support the amount of damages awarded to appellees. Specifically, appellants contend that the damage calculations presented to the jury were based upon the "optimistic projections of an owner" and constituted speculation and conjecture. Appellants urge that substantial evidence did not support a finding that they caused CSC to lose any clinical studies. In response, appellees argue that substantial evidence supported both the amount and the cause of damages. Appellees further assert that the damage calculations presented to the jury were consistent with accepted methods of calculating lost-profit damages.

Case law principles governing the award of damages for lost profits are well established. Lost profits are consequential damages in that they do not flow directly and immediately from a breach of a contract, but flow from some consequence or result of the breach. *See Smith v. Walt Bennett Ford, Inc.,* 314 Ark. 591, 864 S.W.2d 817 (1993). When a party who has suffered a breach of contract seeks recovery of anticipated profits, had the contract not been breached, he or she must present a reasonably complete set of figures to the fact-finder and should not leave it to speculate as to whether there could have been any profits. *See Interstate Oil & Supply Co. v. Troutman Oil Co.,* 334 Ark. 1, 972 S.W.2d 941 (1998). Lost profits must be proven by evidence showing that it was reasonably certain the profits would have been made had the other party carried out its duties under the contract. *Id.* Such proof is speculative when based upon projected sales if there are too many variables to make an accurate projection. *Id.* However, if it is reasonably certain that profits would have

resulted had the contract been carried out, then the complaining party is entitled to recover. *Id.; Jim Halsey Co. v. Bonar,* 284 Ark. 461, 683 S.W.2d 898 (1985). Proof of an established business's past profits is sufficient proof of its lost future profits. *See Mine Creek Contractors, Inc. v. Grandstaff,* 300 Ark. 516, 780 S.W.2d 543 (1989). Lost net profits, not lost gross profits, are recoverable. *See Interstate Oil & Supply Co., supra.* In *Interstate Oil,* we discussed non-speculative lost-profit damages. We stated that a party seeking to recover lost-profit damages must present a reasonably complete set of figures that does not leave the jury to speculate as to whether there could have been any profits. *Id.* at 6, 972 S.W.2d at 943. Lost profits must be proven by evidence showing that it was reasonably certain the profits would have been made had the other party carried out the agreement. *Id.*

In the present case, both parties' experts presented damages based on the gross revenues from six clinical studies and the relevant deductions that they calculated as variable costs. Appellees' expert, Dr. Ralph Scott, presented a set of calculations based upon proposed study budgets for CSC's loss of clinical studies. These studies included four Shire studies, a Wyeth study, and an Abbott study; projected revenues from each study; incremental costs; and lost incremental profits for a total economic loss of $1,579,024.97. For his calculations, Scott relied upon Giblin and other CSC employees in studying CSC's budgets and in determining fixed and variable costs. Scott testified that his calculations represented a conservative estimate of the damages because he only identified the six specific studies that CSC lost during that time period. In contrast, appellant's expert, Jay Marsh, testified that overhead expenses, such as rent and full-time salaries, equaled variable costs. However, Marsh agreed that, as-

suming CSC had obtained the six studies, CSC would have obtained the stated contractual amounts.

We have stated that a jury determines the credibility of the witnesses and the weight and value of their evidence, and it may believe or disbelieve the testimony of any one or all of the witnesses, though such evidence is uncontradicted and unimpeached. *Kempner v. Schulte,* 318 Ark. 433, 885 S.W.2d 892 (1994). Here, the jury heard dueling experts on the subject of lost-profit damages and chose to believe Scott's testimony. For these reasons, we cannot say that the jury's award of damages was in error.

Further, appellants argue that neither the amount nor the proximate cause of damages was supported by substantial evidence. Citing *Stewart Title Guaranty Co. v. American Abstract & Title Co.,* 363 Ark. 530, 215 S.W.3d 596 (2005), appellants contend that, in proving causation, CSC had to produce substantial evidence that the drug companies refused to award the studies to CSC and that the refusal was induced or caused as the result of improper interference by appellants. This argument goes to the heart of appellees' tortious-interference claim. There are four elements of a tortious-interference claim: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Belin v. West,* 315 Ark. 61, 864 S.W.2d 838 (1993). Here, appellants' argument involves the causation element of appellees' allegation of tortious interference. Because we previously held that

appellants did not preserve their sufficiency argument on tortious interference, we decline to reach appellants' argument on this issue.

### D. *Defamation*

■ For the fourth point on appeal, appellants argue that substantial evidence does not support the jury's defamation verdict. Specifically, appellants contend that substantial truth is an absolute defense to defamation and that they were truthful about Giblin's diagnosis of drug addiction and subsequent treatment. Appellees respond that the defamation verdict should be affirmed on the basis that the jury properly determined the factual question of whether the statements made by Boellner were substantially true.

■ The following elements must be proven to support a claim of defamation: (1) the defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages. *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 69 S.W.3d 393 (2002); *Brown v. Tucker*, 330 Ark. 435, 954 S.W.2d 262 (1997); *Minor v. Failla*, 329 Ark. 274, 946 S.W.2d 954 (1997).

■ In defamation actions, there must be evidence that demonstrates a causal connection between defamatory statements made and the injury to reputation. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999). A plaintiff must establish actual damage to his reputation, but the showing of harm may be slight. *Id.* A plaintiff must prove that the defamatory statements have been communicated to others and that the statements have affected those relations detrimentally. *Id.* It is not necessary to prove the literal truth of the accusation in every detail but that the

imputation is substantially true, or as it is often put, to justify the gist, the sting, or the substantial truth of the defamation. *Pritchard v. Times Sw. Broadcasting, Inc.*, 277 Ark. 458, 642 S.W.2d 877 (1982).

Appellants cite *Pritchard* for the proposition that Boellner's statements about Giblin were substantially true and that no reasonable jury could conclude that the substantial gist or sting of those statements were untrue. However, in viewing the evidence in the light most favorable to appellees, the jury disbelieved Boellner's statements about Giblin and found substantial evidence to support a defamation verdict. Here, Giblin testified that Boellner and Gibson hired him in September 2002. Initially, Giblin interviewed with Boellner and applied for a position held by Dr. Alex Zotos, whom Giblin knew from his association with Alcoholics Anonymous (AA) and the Physician's Health Committee. Giblin testified that he told Boellner about his alcohol abuse during his service with the Navy and his rehabilitation in 1993. Giblin maintained that he shared with Boellner what he learned in his AA meetings. However, Giblin stated that he never had any discussions with Boellner about prescription drug use or being a drug addict. Giblin testified that Boellner was aware of Giblin's random drug tests, but Giblin claimed that those tests were not ordered by the Arkansas State Medical Board. Giblin further testified that he remained sober from January 9, 1993, until November 21, 2001, when he entered Talbott Recovery Campus. According to Giblin, he spent three months in Talbott and a short stint in Serenity Park. Giblin admitted that, out of ninety-three tests, four were positive. Giblin acquired two positive tests in 2003 for amphetamines after taking Allegra D and Sudafed and two positive tests in 2006 for opiates, namely Percocet and Darvocet, after a rotator-cuff

surgery. Giblin asserted that he had not had any relapse in abusing alcohol and was "very proud of [his] sobriety."

Boellner testified that he interviewed Giblin, who stated that he had an addiction problem in the early 1990s and sought treatment in 1993 for alcohol abuse. According to Boellner, Giblin informed him that he had attended AA meetings since 1993 and underwent periodic drug screenings. Boellner testified that, in 2007, Giblin asked him to write a prescription of Adderall for his wife and, as a result, Boellner was "concerned." Boellner admitted that he wrote a letter on June 25, 2007, to the chairperson of Copernicus IRB, notifying the IRB of CSC's actions and that Giblin was "under weekly follow-up treatment for previous drug abuse." Boellner also testified that he wrote a letter to Slaven, with a copy to the study sponsor, Abbott, notifying Arkansas IRB of CSC's actions and that the newly proposed PI, Giblin, was required by the Arkansas State Medical Board to "attend a weekly drug abuse program which he still attends and receives frequent random drug tests."

The jury also heard testimony from Gibson, Schmidt, and Gentry, who testified that they heard Boellner tell a potential sponsor that Giblin was a drug addict. Kandi McNeal, Gibson's secretary, testified that she heard Boellner tell a prospective Abbott representative that Giblin was "in rehab" and "had a drug problem." Additionally, the court admitted into evidence Boellner's two letters and Giblin's file, which included his Talbott medical records, with the Physician's Health Committee.

Based upon this evidence, Boellner identified Giblin in his statements, implied that Giblin had substance-abuse problems, and communicated those statements to third parties. However, the jury gave weight to that testimony indicating that Boellner's statements were not substantially true. We have often stated that it is within the province of the jury to resolve any conflicts in the testimony and to judge the weight and credibility of the evidence. *McCoy v. Montgomery*, 370 Ark. 333, 259 S.W.3d 430 (2007). Therefore, we hold that substantial evidence supported the jury's verdict for defamation.

Further, we decline to address appellants' argument concerning reputational injury, or the damages element of defamation, to Giblin, as appellants failed to raise this issue in their motion for directed verdict. We have observed that a motion for a directed verdict is a condition precedent to moving for JNOV. *Thomas, supra.* Because a motion for JNOV is technically only a renewal of the motion for a directed verdict made at the close of the evidence, it cannot assert a ground not included in the motion for a directed verdict. *Id.* Therefore, appellant's argument on reputational injury is not preserved.

### E. *Jury Instructions*

For the fifth point on appeal, appellants argue that the circuit court erred in refusing to give the following instruction they proffered on improper conduct, truth, and reputational damages. Specifically, appellants contend that the trial court erred in submitting appellees' modified Arkansas Model Jury Instruction—Civil 404. Appellants further urge that the circuit court erred in declining their proffered instructions on truth and reputational damages because the given instructions did not accurately reflect the law. In response, appellees assert that the circuit court properly gave appellees' modified AMI Civ. 404 and denied the remaining two instructions on substantial truth and reputational damages.

Under Arkansas law, a party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support giving the instruction. *Barnes v. Everett*, 351 Ark. 479, 95 S.W.3d 740 (2003). We will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Id.* Even where a proffered instruction accurately reflects the case law, however, failure to give the instruction is not error when an AMI instruction covering the same subject matter is on point, due to our longstanding preference in favor of AMI instructions over non-AMI instructions. *See Wal–Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991).

First, we examine appellants' proffered instruction on improper conduct. AMI Civ. 404 specifically states that "[p]laintiff contends that defendant's conduct was improper because [describe succinctly the nature of conduct at issue]." Here, appellants' proffered instruction read: "Plaintiffs [Appellees] contend that the Boellners' conduct was improper because Dr. Boellner informed two IRBs and study sponsors that Dr. Giblin had a history of previous drug abuse, for which he received follow-up treatment." The circuit court denied the proffer and opted to give the following instruction proffered by appellees:

> Plaintiffs contend that the Boellners' conduct was improper because of the June 25, 2007 letter from Dr. Boellner to Copernicus IRB, the July 2 letter from Dr. Boellner to the chairman of the Arkansas IRB, which was copied to Abbott representatives, [and] verbal statements made by the defendants to CSC sponsors regarding Dr. Giblin being a drug addict and in rehab. CSC financial stability and professionalism [sic]. For statements made by Dr. Boellner to

CSC's landlord that CSC would be out of business in three months. . . . [W]ithholding information from new owners, which was necessary to obtain in business. . . . [P]rocuring studies in the name of Neurology and Clinical Studies Center. And . . . tampering with CSC's mail.

Here, the circuit court merely instructed the jury what appellees contended with allegations in evidence. We hold that the circuit court properly gave this jury instruction because what appellees contended is simply explanatory and is nothing more than a summary of the case.

Second, we examine appellants' proffered instructions regarding truth as a defense and the burden of proof for reputational damages. Appellees proffered the following instruction on truth as a defense to defamation: "Truth is a defense to defamation, but exact truth is not required. It is not necessary to prove the literal truth of the accusation in every detail. It is sufficient to show that the imputation is substantially true." The court denied giving this instruction because it was a non-AMI instruction. Finally, appellants proffered an instruction on reputational damages, which read, "To establish damages for defamation, the claimant must establish actual damage to his reputation and not merely speculation, but the showing of actual harm is slight." The circuit court denied appellants' proffered instruction and gave general instructions on damages.

On the issue of defamation, the circuit court read AMI Civ. 411 to the jury. AMI Civ. 411 defines defamation as follows:

> A defamatory statement is a statement of fact that is false and actually causes harm to a person's reputation. In determining whether the statement was defamatory, it must be considered as a whole, and the words must be taken in their plain and natural meaning. In

determining whether or not a recipient of the statement reasonably understood the statement in a defamatory sense, you must take into account the surrounding circumstances known to the recipient at the time the statement was made.

In this instance, we conclude that AMI Civ. 411 covered the subject of a defamatory statement as "a statement of fact." With regard to truth as a defense, AMI Civ. 411 states that the statement must be false and must be "considered as a whole," taking into account the plain meaning of the statement and the circumstances surrounding the statement. Additionally, the circuit court also allowed counsel to present arguments on substantial truth. With regard to damages, AMI Civ. 411 clearly states that a defamatory statement "actually causes harm to a person's reputation." The given instruction properly covered the same subject matter proposed by appellants in their instruction. Therefore, we hold that the circuit court did not abuse its discretion in refusing to give appellants' proffered instruction on defamatory statements.

### F. Cross-appeal: IRA Exemption Statute

Appellants requested the exemption of over $1.1 million contained in an IRA, pursuant to the exemption statute set forth in Arkansas Code Annotated section 16–66–220(a)(1).₂₄ On cross-appeal, appellees argue that section 16–66–220(a)(1) conflicts with article 9, section 2 of the Arkansas Constitution, which provides that personal property exempt from seizure cannot exceed $500. Appellees assert that the IRA exemption statute contravenes the plain language of the Arkansas Constitution by allowing personal-property exemptions in excess of the constitutionally mandated $500. Appellants respond that

section 16–66–220(a)(1) is constitutional because the $500 exemption in the Arkansas Constitution does not restrict or set a cap on exemptions but acts only as a floor below which the legislature may not descend.

Although the circuit court ruled on this issue from the bench, the final, written order did not address this issue. In a case where the judge made a constitutional decision from the bench, we stated, "Pursuant to Administrative Order 2(b)(2), an oral order announced from the bench does not become effective until reduced to writing and filed." Oliver v. Phillips, 375 Ark. 287, 290 S.W.3d 11 (2008). When the circuit court makes no ruling on an issue, the appellate court is precluded from reaching the issue on appeal. Id.

In the present case, the circuit court applied the Arkansas constitutional provision in its ruling from the bench, stating, "I am of the opinion ... that probably the Constitution gives a floor and not a ceiling, so I will not hold that the IRAs are reachable." However, in the circuit court's order, dated December 28, 2009, the court simply stated that the IRA account is "exempt from attachment, garnishment, and execution" under the provisions of section 16–66–220(a)(1) and ordered the writ of garnishment to be quashed. The court made no ruling on the constitutionality of section 16–66–220(a)(1) in its December 28, 2009 order. Because the circuit court made no ruling upon the constitutionality of section 16–66–220(a)(1), this issue is not preserved for our review, and we are precluded from reaching the merits of appellees' cross-appeal.

Affirmed on direct appeal; affirmed on cross-appeal.